Wang HE, Petitioner,

v.

John ASHCROFT, Attorney
General, Respondent.

No. 00–70652.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 6, 2002.

Filed May 12, 2003.

Jisheng Li, Law Office of Jisheng Li, Honolulu, HI, for petitioner.

Karen Fletcher Torstenson and Heather R. Phillips, Office of Immigration Litigation, Washington, DC, for respondent.

* The Honorable Robert E. Cowen, Senior Circuit Judge for the Third Circuit, sitting by designation.

Before COWEN,* HAWKINS and W. FLETCHER, Circuit Judges.

**OPINION**

WILLIAM A. FLETCHER, Circuit Judge.

In this case, we review a denial of asylum and an explicit finding by the Board of Immigration Appeals ("BIA") that petitioner Wang He's testimony in support of his asylum application was not credible. After fleeing China, Mr. He arrived in Guam and sought asylum and withholding of removal. Mr. He claimed that he and his wife had been persecuted by the Chinese government based on their opposition to China's population control policies. Specifically, he claimed that, following the birth of their second child, his wife had been involuntarily sterilized. Based on that past incident of persecution, Mr. He requested asylum. The BIA found that Mr. He was not credible and refused to believe that his wife had been involuntarily sterilized.

We hold that the BIA's adverse credibility finding was not supported by substantial evidence. We therefore conclude that Mr. He has established his eligibility for asylum. We remand for a determination of Mr. He's eligibility for withholding of removal and, in the event he is not found eligible for withholding of removal, for the exercise of the Attorney General's discretion whether to grant asylum.

**I. Background**

On January 5, 1995, petitioner Wang He married. Just over a year later, he and

his wife had their first child, a daughter. Mr. He and his wife married before they reached the legal age for marrying, and they had their first child before they reached the legal age for child-bearing. Because of their age, they were fined when Chinese birth control officials learned of the birth of the child. Mr. He paid the fine. Over three years later, on September 4, 1998, they gave birth to their second child, a son. Mr. He claims that his wife was forcibly sterilized a month after the second birth.

According to Mr. He's testimony before the Immigration Judge ("IJ"), a group of ten, or possibly more, officials arrived at his house at about 7:00 am on the morning of October 5, 1998. Mr. He attempted to block the door, but several members of the group forced their way into the house and held Mr. He against a wall. They then forced Mr. He's wife out of the house and drove her to the hospital. Mr. He asked his mother to take care of his children, and he and his sister-in-law hired a motorized tricycle to go to the hospital.

Mr. He arrived at the hospital at about 7:30 am. Mr. He testified that after waiting "for a little while" at the hospital, he saw his wife walking out of the hospital. She was pale and was supported by two nurses as she walked. He and his wife did not speak. Mr. He said, "I only carry inside . . . . I was so painful . . . . I couldn't speak because I was so angry, and when I saw my wife was pale, I was so angry, I cannot speak anything." According to Mr. He, a woman from the hospital gave him a sterilization certificate before they left. Also before they left, a man from the Birth Control Office said that Mr. He would have to pay a large fine for having a second child. Mr. He testified that he never paid the second fine.

Documentary evidence was introduced at the hearing to support Mr. He's testimony. That evidence included a photograph of Mr. He and his wife. The IJ wondered aloud at the hearing whether the photograph was a composite of two individually taken photographs, but did not take steps to obtain a forensic determination of whether this was so. Other evidence included a receipt for 5,000 RMB, dated February 10, 1996, evidencing payment of a "Fine for having a child before reaching the required age"; a photograph of the sterilization scar on the abdomen of Mr. He's wife; and a sterilization certificate dated October 5, 1998.

Sometime after his wife's sterilization, Mr. He fled China. After arriving in Guam on a smuggler's boat, Mr. He was detained by INS agents. He requested asylum and withholding of removal. A hearing was held before an IJ on Guam.

## II. Standard of Review

We review credibility findings under a substantial evidence standard. *See Aguilera–Cota v. INS,* 914 F.2d 1375, 1381 (9th Cir.1990); *see also* 8 U.S.C. § 1252(b)(4)(B) ("[A]dministrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary."); *INS v. Elias–Zacarias,* 502 U.S. 478, 481, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992) ("The BIA's determination that [an applicant] was not eligible for asylum must be upheld if supported by reasonable, substantial, and probative evidence on the record considered as a whole." (internal quotation marks omitted)). Adverse credibility findings are thus afforded significant deference, but the IJ and the BIA must nonetheless offer a "specific, cogent reason for any stated disbelief." *Hartooni v. INS,* 21 F.3d 336, 342 (9th Cir.1994). We generally review only the BIA's credibility decision, *see Castillo v. INS,* 951 F.2d 1117, 1120 (9th Cir.1991), but when the BIA incorporates the IJ's

decision as its own, we treat the IJ's reasons as the BIA's, *see Gonzalez v. INS*, 82 F.3d 903, 907 (9th Cir.1996).

After hearing Mr. He's testimony, the IJ concluded that Mr. He's story was implausible but stopped short of making an explicit adverse credibility determination. Rather, he held that even if Mr. He's testimony were taken as credible, he had not established that his wife had been involuntarily sterilized. The BIA, however, did make an adverse credibility finding. It noted a problem in the timing of events in Mr. He's story. "This problem, combined with the other problems noted by the Immigration Judge, cause us to be in agreement with his assessment that the respondent's story in this regard is not credible." Because the BIA's adverse credibility finding relied on the combination of the problems the IJ noted and the timing problem it noted on its own, we examine both the oral opinion of the IJ and the written decision of the BIA.

### III. Discussion

#### A. Interpreting Difficulties

At the outset, we note that some of the evidentiary problems in this case appear to stem from interpreting difficulties. Mr. He had a hearing on Guam on Monday, September 13, 1999, before an IJ who was detailed from the continental United States only until the end of that week. The interpreter spoke Mandarin but did not speak Mr. He's dialect. After the following exchange, the IJ nevertheless decided to proceed:

Q. [By the IJ:] Now Ms. Way [the interpreter], did you have a chance to talk to Mr. He, Wang, here in the last few minutes.

A. Yes, Your Honor.

Q. And, what language does he speak?

A. He speaks Mandarin. He said that he tried to speak in Mandarin, only a few words, maybe he was speaking his own hometown dialect, which is Foo Ching dialect.[1]

Q. All right.

. . .

A. I could understand a little of the Foo Ching dialect.

Q. [IJ to Mr. He:] Mr. He, what language do you speak the most fluent?[2]

A. [Through the translator:] It's hard to talk about fluently. But, I will speak very slowly in Mandarin. Sometimes it's hard for me speak Mandarin. I convert to Mandarin.

Q. How much education do you have?

A. I had a first year of junior high school [after five years of elementary school].

Q. First year. Did you learn Mandarin in school?

A. Yes. I did study Mandarin when I was in school, but after that—after I get out of school, I was doing farming. So, I did not have a chance to talk to outside people. So, I kind of forgot it.

Q. All right. Let me tell you what we're going to do. We're going to proceed these proceedings in the Mandarin language, because even though I reviewed your case last Saturday, and realized that there was a question whether we had a Foo Ching interpreter or not, ap-

---

**1.** The names of the dialects appear to be rendered phonetically in the record. We refer to the dialects by the phonetic spellings that appear there.

**2.** Throughout this opinion, we quote from the transcript without using the notation "sic."

parently we don't. But, you appeared in court on at least three occasions, all on telephonic hearing. And thereby, during those hearings, you spoke Mandarin. All right. So we're going to proceed in the Mandarin language. And, when you have a problem understanding the questions, please let me know.

A. Yes.

The IJ was partially mistaken in his understanding of what had transpired in the three preliminary hearings. All three were relatively short telephonic hearings, conducted by a different IJ, dealing with matters such as scheduling and obtaining an attorney. During all three hearings, Mr. He had been in Guam and the IJ had been in Hawaii. During the first two hearings, the translator had spoken Mandarin. During the third hearing (the longest of the three), the translator had spoken the Foo Chow (not the Foo Ching) dialect.

Mr. He did not object to the IJ's decision to proceed on September 13 with the translator who spoke Mandarin but not his Foo Ching dialect, and he does not argue here that his due process rights were violated by the use of this translator. But it is clear from the transcript that Mr. He had difficulty understanding and making himself understood. Indeed, some portions of the transcript read like "Who's on First." We give two examples. Both occurred during questioning by the IJ, and, in both, the difficulty was compounded by the IJ's impatience.

▆▆▆ First, Mr. He had difficulty telling the IJ how old he was:

Q. [By the IJ:] When you were born? When you were born on September 2, 1976, how old were you when you were born?

A. You mean, now?

Q. No, no. I said, when you were born on September 2, 1976, how old were you on that date, according to your custom?

A. There are two counts. You can count it one day old or you can count it one year old.

Q. All right. Let me ask it this way. You were born on September 2, '76, is that right?

A. Yes.

Q. A year later, on September 3rd of '77, how old would you be, according to your custom?

A. '77?

Q. Yes.

A. Four years old. You mean, '77?

Q. Listen to the question. All right. You were born on September 2, '76. A year later, on September 3rd, '77, how old do you consider or do you count for yourself, according to your custom, on September 3rd, '77?

A. Some people say it's one year old. And, some people say it's two years old. Some other people say little bit more than two years and one day.

Q. How would you say?

A. There's no difference in the countryside. There's no difference. Just say when you were born, that's it.

Q. All right. But, according to Counsel for the Government, who asked you your question, because when you get married, she calculate and I agree with her, that you were still 18–years–old, and you say that's the custom.

A. Because in our place, you only minus one—one year old, one year and another minus two years.

Second, during cross-examination, Mr. He had difficulty describing how he was

given a certificate of sterilization as his wife left the hospital:

Q. [By The IJ:] So, you are saying that morning people came to your house at 7:00 o'clock, to your wife to the hospital, you hired a tricycle with your sister-in-law, you flew over to the hospital, you were there at about 7:30, you saw her walking out. She looked pale. It hurt inside, but you didn't say anything to each other. You then ran inside the hospital, get this certificate. Is that right?

A. No, they—she brought out.

Q. So, she walked out, holding in her hand the certificate?

A. That was a woman.

Q. So, a woman who walked her out had the certificate?

A. No. That was nurses. That was nurses that hold my wife.

Q. I just want to know whom you got that certificate from. You kept saying no, but I—hold a second.

A. I got it from the woman's hand.

Q. Which woman?

A. In the hospital also is a Birth Control Office woman.

Q. Did you go inside and get the birth certificate—I mean the sterilization certificate, or did they bring it out to you?

A. She gave it to me.

Q. I thought you told us that your wife had it in her hand?

A. No. No, that woman hand it to me.

Q. All right. I was not there. And, nobody was there on that January—on that February 5, 1996—on October 5, 1998, I was not there. [To the translator:] Translate that.

"[A] competent translation is fundamental to a full and fair hearing. If an alien does not speak English, deportation proceedings must be translated into a language the alien understands." *Perez–Lastor v. INS*, 208 F.3d 773, 778 (9th Cir. 2000). Due process requires that an applicant be given competent translation services. *See id.* at 777–80. Mr. He has not argued, and we do not hold, that the inadequate translation services he received constituted a denial of due process. But many of the difficulties in this case might have been avoided if the IJ had been willing to take the time necessary to arrange a Foo Ching translator, and if the IJ had been willing to question Mr. He more patiently and more carefully. Even where there is no due process violation, faulty or unreliable translations can undermine the evidence on which an adverse credibility determination is based. *See Balasubramanrim v. INS*, 143 F.3d 157, 162–64 (3d Cir.1998) (reversing the BIA's asylum denial where the BIA's adverse credibility determination was based on testimonial inconsistencies possibly caused by the applicant's difficulty speaking English).

## B. Problems Perceived by the IJ

The IJ identified three principal problems with Mr. He's testimony. First, the IJ doubted Mr. He's testimony about the size of the group that arrived at his house on the morning of October 5. Mr. He had testified that ten (or more) people were in the group. In his oral opinion, the IJ disputed this aspect of Mr. He's account:

[Mr. He] testified that on October 5, 1998, more than ten people riding in a truck, came to his house. The Court notes, as the Court indicated, that there was some question as to why birth control officials had to send more than ten people to force a woman to under sterilization. Nothing in the record justifies that number of persons.

Later in his oral opinion, the IJ noted, "I find the part where he testified five people came to his house, the circumstances as to how he received the last warning, to be implausible." (The IJ obviously meant ten rather than five.)

 During direct examination, Mr. He testified that he was eating breakfast when, "I saw—at that time I saw a car came—approached to my saw. And then, I saw few people jump out of the car." Then the IJ intervened:

Q. How many people together were there, coming in that car?

A. At that time, I was in hurry. Seems like more than ten, or ten some people.

Q. What kind of car was that?

A. My countryside, missionary car. It's the cadre used, it's for every cadre used.

Q. Ten people in the car, more than ten people you said?

A. Yes.

. . .

Q. Why did you believe that they had to send more than ten people to your home?

A. This maybe, might be somebody report in.

Q. Yeah. But, why did they have to send people. Were you some kind of dangerous?

A. Because in the countryside, if we are not be caught, then we would be free or we ran away.

. . .

Q. All right. Now they say—were you armed at home? Did you have a weapon?

A. No.

Q. Did you have a knife?

A. No.

Q. Were you known as dangerous?

A. No.

Q. Do you know like—were you known as kung fu master of some sort?

A. No.

Q. Then, why did they send ten people. I still don't understand? You said more than ten. You must danger-ous—be perceived as dangerous.

A. If they only send one or two people, or if he ran away, we would run away. If they (indiscernible), not be caught and we could run away.

Q. Did you run away?

A. At that time, I couldn't run away.

Q. Well, you thought, you blocked the door.

A. Yes.

Q. So you didn't want to run away.

A. Because I couldn't run away, be-cause I was forced to the wall by two people at least, and I cannot go.

. . .

Q. All right. So, there were ten peo-ple. But, how many people in the car? Can you tell me again? You said more than ten, but I don't know exactly.

A. It's ten some people.

Q. Like twelve? Thirteen?

A. At that time they were in a hurry, and I didn't count. At that time, I was in a hurry, I didn't count.

Q. But, you're sure it's more than ten?

A. About more than ten people. They jumped out.

Q. Did they all come into your house?

A. No.

Q. How many came into your house?

A. At that time, I was forced against the wall, and I saw three or four people were in.

. . .

Q. All right. So (indiscernible). Was that—what kind of car, again, was that like? A van?

A. It's a long truck, kind of a long truck. In the countryside, we call machinery car.

The IJ's conclusion that Mr. He's testimony was implausible is not supported. Contrary to the IJ's oral opinion, there is indeed something in the record that "justifies that number of persons" sent to seize Mr. He's wife to be sterilized against her will. The birth control officials obviously anticipated that Mr. He and his wife would attempt to resist or escape. Mr. He specifically testified that he had attempted physically to block the door, and that after the cadres forced the door open he had been forcibly held against the wall. He testified further that the large number of people had been sent to ensure that he and his wife would not be able to run away. Moreover, despite the IJ's obvious skepticism, Mr. He remained consistent and steadfast on a factual point that did not make that much difference to the truth of his claim. Whether five people or ten people came to take his wife for involuntary sterilization, it would nonetheless have been involuntary. Because the number did not make much difference, there was little reason for Mr. He to lie about it.

Second, the IJ concluded that the certificate of sterilization was, at most, a certificate of voluntary sterilization. He stated that the Profile of Asylum Claims indicated that the United States Embassy and Consulate General are unaware of any certificates being given after an involuntary *abortion:* " 'According to Embassy officials, the only document that might resemble such a certificate and result in confusion, is a document issued by hospitals upon the patient's request after a voluntary abortion.' " The IJ's reliance on the statement in the Profile is misplaced, for the statement specifically refers to abortions, not to sterilizations. After the IJ issued his oral opinion, Mr. He's lawyer pointed out the distinction between forced abortion and sterilization, and asked the IJ to reconsider his decision. The IJ responded: "I know that. But, I make that finding because he didn't even mention about certificate of sterilization." The IJ's response fails to explain why abortion and sterilization certificates should be treated similarly, and, in addition, misstates the evidence. Contrary to the IJ's response, Mr. He gave detailed testimony about the certificate of sterilization and its delivery to him as his wife walked out of the hospital.

Third, the IJ doubted that Mr. He had ever been asked to pay a second fine after the birth of their second child. In his ruling, the IJ said:

[I]t is clear that the respondent failed to show that it was forced upon his wife .... [T]here was no information whatsoever to show that there is a fine imposed on the birth of the second child, and clearly, according to the record, this respondent had a second child .... The evidence in this case simply shows that this respondent's family was not fined on the birth of the second child. The only evidence he submitted, which I found not to be credible and for the following reason, is that while he was assisting his wife to get into the tricycle a male official rushed out, came and told him he will have to pay a fine otherwise he would have to suffer severe consequences. The last incident was never mentioned anywhere in his application, nor in his initial testimony. Once a sudden, out the blue, that man came out and added to complete the story.

The reason for doubt offered by the IJ is simply not persuasive. There is no evidence in the record that Mr. He made up

the second fine to bolster a shaky story. Rather, he offered testimony about the second fine as soon as it became relevant.

During cross-examination, the INS lawyer asked Mr. He why he and his wife had not received a formal marriage certificate once they reached the legal age. Mr. He responded that by the time they reached the legal age, his wife was already visibly pregnant with their illegal second child, so they could not seek a marriage certificate without subjecting themselves to punishment. Mr. He said that they were still unable to obtain a marriage certificate following the birth of their second child because the birth control officials (in addition to sterilizing his wife) had again imposed a fine on them. Unable to pay this second fine, Mr. He and his wife could not register their marriage.

The IJ, apparently concerned that Mr. He mentioned this second fine for the first time on cross-examination, asked him to describe it in more detail. Mr. He said that, while he was at the hospital on the day of his wife's surgery, a birth control official had approached him and told him that he would be liable for a second fine. The IJ wanted to know why Mr. He had not mentioned this second fine earlier in the hearing. Mr. He answered that he had not been asked about it.

A. I thought you only asking me about my wife, so I didn't talk about the fine part.

Q. So, are you telling me I didn't ask you clear, I wasn't clear enough in my question?

A. If you—if you ask me did anybody ask you pay fine, then I will tell you. But, I thought you didn't ask me that, so I didn't say it.

Q. I asked you what happened between the time you arrived there until the time you and your wife went home. I think that's very clear.

A. I thought—when I return, take my wife, at that moment he came right into me and ask me to pay the fine.

Q. Let me ask you.

A. I thought you didn't care that time, so I didn't mention.

. . .

Q. All right. Now you told me—or, you told us today, that you hired a tricycle, is that right? Is that, all right.

A. No, today I didn't hire today.

Q. Today you told me that.

A. Today I'm here.

Q. I know you didn't hire a tricycle today. All right. You told us you hired a tricycle, right? Right?

A. Yes.

Q. Did I ever ask you anybody here ever ask you about a tricycle? Nobody ever asked you about a tricycle.

A. Oh, I forgot that. I'm sorry. I'm sorry, very sorry.

Q. You told us. All right. Now, you told us you came to the hospital with your sister-in-law, right? Right?

A. Yes.

Q. Did anybody here ever ask you anything about your sister-in-law?

A. No.

. . .

Q. Then, why in the world when you failed to mention that officer fining you and I ask you that question, you told me because I didn't ask you.

A. I thought it doesn't matter, so I didn't say it.

Q. I think, sir, that you're trying to go with something and you're trying to show me how smart you are.

The IJ clearly grew impatient during this exchange. But nothing in Mr. He's testimony supports a determination that he was lying. When giving his account of his wife's sterilization, Mr. He did not include the second fine in his story. That Mr. He did not elaborate during his direct testimony can be explained in part by the obvious difficulty he had speaking a language he did not know well. That he did not tell of the fine until it was relevant to the question of why he had not formally registered his marriage does not show he was lying about the involuntariness of his wife's sterilization.

## C. Additional Problem Perceived by the BIA

The BIA affirmed the IJ's decision. While recognizing that the IJ had not made an explicit adverse credibility determination, the BIA noted that the IJ had doubted some aspects of Mr. He's testimony about the day his wife was sterilized. The BIA agreed with the IJ that the voluntariness of the sterilization was the "key issue" in Mr. He's case, and that Mr. He's "story in this regard is not plausible." In addition to the doubts expressed by the IJ, the BIA also doubted the timing of the events recounted in Mr. He's story. The BIA wrote:

> The respondent testified that his wife was seized at approximately 7:00 in the morning and he followed almost immediately with his sister-in-law, quickly arriving at the hospital by 7:30. He stated that shortly thereafter, he saw his wife walking out of the hospital being helped by two nurses. We do not find it plausible that the officials could have arrived at the respondent's home at approximately 7:00, traveled to the hospital and had the spouse anesthetized, and then the operation completed shortly after the respondent's arrival at the hospital. This problem, combined with the other

problems noted by the Immigration Judge, cause us to be in agreement with his assessment that the respondent's story in this regard is not credible.

During his hearing, Mr. He was asked what time the cadre had arrived at his house the morning of the sterilization. He responded: "It might be around 7:00." He said that he and his sister-in-law had arrived at the hospital "around 7:30." Some time later, his wife emerged: "I was waiting there for a little while, and now I saw my wife was very pale and then walked out the hospital." At the time of the hearing, neither the INS lawyer nor the IJ expressed any doubts about this aspect of Mr. He's story, nor did they inquire about what he meant by "a little while." Nor was Mr. He cross-examined about the timing of events of the morning his wife was sterilized. Indeed, he said very little about it.

More important, the vague description of the elapsed time, combined with the difficulties of translation, greatly undermine the BIA's reasoning. The BIA's doubts about the story's timing of events rested almost solely on Mr. He's statement that his wife emerged from surgery after he had arrived at the hospital and waited "for a little while." As described above, Mr. He was testifying in Mandarin, a language he did not know well, because the INS had not provided a translator who spoke his dialect. All the BIA had before it was a transcription of a translator's attempt to interpret Mr. He's own translation from his native Foo Ching dialect into Mandarin. It is impossible to glean a precise meaning from a statement that appears in the record as "a little while." Further, because Mr. He was not cross-examined about the timing of events, he had no reason or opportunity to explain what he meant. From the transcribed testimony, we cannot tell whether Mr. He

claimed to have waited at the hospital for several minutes or several hours.

### D. Conclusion

The IJ gave three reasons for doubting Mr. He's testimony—the implausibility of his story that ten people came to his house to forcibly take his wife to be sterilized; the fact that United States embassy officials were aware of certificates issued after voluntary abortions but not after involuntary sterilizations; and the fact that Mr. He mentioned the second fine late in his testimony, only when he was questioned about why he and his wife never formally registered their marriage. None of these reasons is supported by substantial evidence in the record. Mr. He explained that ten people might have been thought necessary to subdue him and his wife and to prevent them from running away. Mr. He's attorney pointed out to the IJ that the Embassy statement referred to abortions rather than sterilizations. And Mr. He mentioned the second fine when it became relevant to his story and the questions he was asked. The BIA relied on the IJ's three reasons and added one of its own—the implausibility of Mr. He's wife being forcibly taken from her house and sterilized during the time period between 7:00 and shortly after 7:30 am. This reconstruction of the timing of the events is based on a strained and unjustified reading of a single phrase in Mr. He's doubly translated testimony, "a little while."

We conclude that the adverse credibility finding of the BIA is not supported by "reasonable, substantial, and probative evidence." *Elias–Zacarias*, 502 U.S. at 481, 112 S.Ct. 812. The IJ was unwilling to postpone the hearing until a translator who spoke Mr. He's dialect could be procured. He was impatient, hostile, and hectoring in his questions, and he was careless and unjustified in his conclusions. Appar-

ently recognizing the weak support in the record for the IJ's conclusions, the BIA added another reason before making its adverse credibility finding, but the BIA's reason is no stronger than any of the IJ's. Under our case law, we give deference to properly supported credibility findings of the IJ and the BIA. We do not underestimate the difficulty of the task performed by the IJ and the BIA in making credibility determinations in particular cases, or the weight placed upon them by their extremely heavy caseload. But for the system to work, the IJ and the BIA must perform their work in such a manner that our deference is deserved. We are sorry to say that in this case it is not.

### IV. Remedy

■ Having reversed the BIA's adverse credibility finding, we must decide the proper disposition of this case. The Supreme Court has held that "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *INS v. Ventura*, 537 U.S. 12, 123 S.Ct. 353, 355, 154 L.Ed.2d 272 (2002) (quoting *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985)). We believe that this case presents the sort of special circumstance where a remand for additional investigation regarding eligibility would be inappropriate.

In the usual asylum case, the applicant's credibility is not the only issue. To establish eligibility based on past persecution, an asylum applicant must show "(1) an incident, or incidents, that rise to the level of persecution; (2) that is 'on account of' one of the statutorily-protected grounds; and (3) is committed by the government or forces the government is either 'unable or unwilling' to control." *Navas v. INS*, 217 F.3d 646, 655–56 (9th Cir.2000) (footnotes omitted). If the BIA accepts an appli-

cant's story as credible, it must still determine whether the applicant has met the other criteria for eligibility. Under *Ventura*, when we reverse the BIA's adverse credibility determination, we must ordinarily remand the case so that the BIA can determine whether the applicant has met the other criteria for eligibility. Usually, even if we rule that the BIA must take the applicant's story as true, the BIA may still decide that the applicant is ineligible for asylum because, for example, the harm suffered does not rise to the level of persecution, or the persecution was not on account of a protected ground.

In this case, however, the question of whether Mr. He is eligible for asylum turns entirely on his credibility. Congress has made specific statutory declarations about the asylum eligibility of those who are persecuted based on their opposition to birth control policies. Under the Immigration and Naturalization Act ("INA"),

> a person who has been forced to abort a pregnancy or to undergo involuntary sterilization, or who has been persecuted for failure or refusal to undergo such a procedure or for other resistance to a coercive population control program, shall be deemed to have been persecuted on account of political opinion, and a person who has a well founded fear that he or she will be forced to undergo such a procedure or subject to persecution for such failure, refusal, or resistance shall be deemed to have a well founded fear of persecution on account of political opinion.

8 U.S.C. § 1101(a)(42). Thus, under the statute, a person who has been forcibly sterilized is automatically classified as a refugee, and is therefore automatically eligible for asylum. The BIA has ruled that the "forced sterilization of one spouse ... is an act of persecution against the other spouse," and has thereby extended this per se eligibility to those whose spouses have been forcibly sterilized. *See In re C–Y–Z–*, 21 I. & N. Dec. 915, 919–20 (BIA 1997). Thus, if Mr. He's claim that his wife was forcibly sterilized is believed, he is necessarily eligible for asylum under the BIA's interpretation of the INA.

Consequently, remand for further proceedings to determine whether Mr. He has met the criteria for eligibility is simply unnecessary. Nor is remand necessary for further investigation of Mr. He's credibility. The INS, having lost this appeal, should not have repeated opportunities to show that Mr. He is not credible any more than Mr. He, had he lost, should have an opportunity for remand and further proceedings to establish his credibility.

Based on our holding, Mr. He must be deemed a "refugee" under the INA. He is therefore eligible for asylum and an exercise of discretion by the Attorney General. *See* 8 U.S.C. § 1158(b)(1); *Singh–Kaur v. INS*, 183 F.3d 1147, 1149 (9th Cir.1999). We cannot say, however, that Mr. He has necessarily met the more stringent standard for withholding of removal. Even if his story is deemed true, the Attorney General may decide that there is not a clear probability that he would be persecuted if returned to China. *See* 8 C.F.R. § 208.16; *Duarte de Guinac v. INS*, 179 F.3d 1156, 1159 (9th Cir.1999). We therefore remand for further proceedings on whether Mr. He is eligible for withholding of removal. If Mr. He is found to be ineligible for withholding of removal, the Attorney General shall exercise his discretion in determining whether to grant him asylum.

PETITION GRANTED IN PART, REMANDED.