**Mohinder SINGH, Petitioner,**

v.

**John ASHCROFT,\* Respondent.**

**No. 02–72145.**

United States Court of Appeals, Ninth Circuit.

May 13, 2004.

---

\* The petition for review correctly identified the Immigration and Naturalization Service (INS) as the respondent in this transition rule case. Illegal Immigration Reform and Immigrant Responsibility Act § 309(c), Pub.L. No. 104–208, 110 Stat. 3009 (Sept. 30, 1996), as amended. On March 1, 2003, the INS ceased to exist as an independent agency within the Department of Justice (DOJ) and its functions were transferred to the newly formed Department of Homeland Security. Because this appeal challenges a decision issued by the Executive Office of Immigration Review (encompassing both the Board of Immigration Appeals (BIA) and the immigration courts), which is a component of the DOJ, Attorney General Ashcroft, as the head of the DOJ, is substituted for the INS. *See* 8 U.S.C. § 1252(b)(3) (2000) (respondent is Attorney General where immigration court proceeding commenced after April 1, 1997).

Alan M. Kaufman (argued and briefed), Kaufman Law Office, San Francisco, CA, for the petitioner.

Rene Rocque (argued) and Hillel R. Smith (briefed), Office of Immigration Litigation, Civil Division, Department of Justice, Washington, DC, for the respondent.

Before RYMER, HAWKINS and BYBEE, Circuit Judges.

RYMER, Circuit Judge:

Mohinder Singh, a native and citizen of India, petitions for review of the denial of his application for asylum. The Immigration Judge (IJ) denied Singh's application for asylum because she found that he was not credible. The Board of Immigration Appeals (BIA) summarily affirmed. Singh argues that substantial evidence does not support the IJ's adverse credibility determination and that he established asylum eligibility based on past persecution. The record supports the IJ's adverse credibility determination, and we affirm.

## I

Singh is a Sikh from the Punjab state in India. He entered the United States unlawfully on September 25, 1995, and sought asylum after the Immigration and Naturalization Service charged him under section 241(a)(1)(B) of the Immigration and Nationality Act as an alien who had entered without inspection. 8 U.S.C. § 1251(a)(1)(B) (1995).

Singh testified in support of his application and submitted documentary evidence. He claims that he actively supported a political organization called the "Shiromani Akali Dal" since 1978, and that he was arrested three times on account of his political opinion. The first arrest took place sometime in 1987; Singh was unsure of the month. Police came to his home, accused him of being linked to an individual named "Nam Singh" whose father worked on his farm, and kept him in custody for five days. Singh's application states that the second arrest occurred in May 1990, but he testified that it was actually January 20 after he had obtained a death certificate that indicates his father died on January 29, 1990. On this occasion, Singh testified that he was arrested with his father and was beaten. As a result he suffered a broken nose and his whole face was badly swollen. He had stitches and a cast, was treated for a month, and stayed in the hospital. Singh went to his father's funeral within a week of the incident, and photographs taken at the funeral reveal no sign of swelling or other facial injury. Singh explained that he removed the cast because it would not look good in the pictures. Singh also submitted a letter from the Aggarwal Clinic about his injuries and treatment; the letter is dated contemporaneously with the treatment and written in English (which Singh did not understand in 1990). Singh explained that he never saw the letter while he was in India, and that his wife sent it to him for

court in the United States. When asked why the doctor would have back-dated the letter five or six years, Singh explained that the doctor used his old medical records to prepare it.

Singh testified that he went into hiding at his wife's parent's home after the second arrest, but continued to farm and pitch tents for the Akali Dal. He was arrested a third time, in January 1995, while staying there. He claimed to have been held for two days during which time the police hanged him from the ceiling, beat him, and poured a jug of hot water on him, burning his skin. After his release, he was treated for fifteen days at the hospital by the same doctor who had previously treated his broken nose. The doctor's letter does not mention this treatment.

Singh submitted a document from the Shiromani Akali Dal party attesting to his membership. Singh was a farmer, and he testified that he put up posters that supported farmers' rights. He explained that in 1989 he joined the "Mann group" to keep working for benefits for farmers, having chosen this faction because all others were in favor of the government. Although he claims to have personally met Mann while Mann was campaigning in 1989, Mann was in prison at the time according to the State Department's Human Rights Report. Singh was unable to point to anything specific that he did to support Mann's candidacy in the 1989 election, did not know when it was held, and did not vote in that or any other election. He explained that his job was to farm while others would vote. Between his second and third arrests Singh's political activities consisted of working in a Sikh temple kitchen and pitching tents for a celebration on December 25th.

Singh also submitted a letter from his wife in which she reports that police keep

asking for him. His wife and children continue to live in her parent's house.

The IJ found that Singh had not testified credibly and that the documentation he submitted—the death certificate, the Aggarwal Clinic letter, and his wife's letter—did not overcome the inconsistencies in his testimony. Among other things, the IJ's decision points to the funeral photographs that show no visible signs of a broken nose or injuries on Singh's face as he had testified occurred at the hands of the police in January of 1990; the lack of explanation for why the Aggarwal Clinic letter would have been written in English on the date it was supposed to have been written, and if back-dated, made no mention of the fact that Singh was treated by the same doctor in 1995 after his alleged third arrest and mistreatment at the hands of the police; how little knowledge Singh had of political activities in India and the fact that Singh could not have been with Mann when he claimed to have seen or traveled with him; the fact that Singh did not know when the 1989 election took place, did not participate in any national or state elections, and could not explain how the Akali Dal Mann or the Shiromani Akali Dal could accomplish the goal of a separate Sikh state ("Khalistan") without voting; the incorrectness of the reason given by Singh for choosing the Mann faction because it was not the case that other factions were in favor of the government at the time; Singh's inability to articulate what type of work he allegedly did for the Akali Dal Mann group; and Singh's failing to remember when he was first arrested and changing the date of his second arrest to coincide with his father's death certificate, which caused doubt about whether the second arrest had occurred at all.

The BIA summarily affirmed without opinion pursuant to 8 C.F.R. § 3.1(a)(7)(2002).

II

■ The Attorney General has discretion to grant asylum to a "refugee," defined as an alien unwilling to return to his country of origin "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A) (2000). A "well-founded fear of persecution" requires that the alien's fear be (1) subjectively genuine and (2) objectively reasonable. *Singh v. INS*, 134 F.3d 962, 966 (9th Cir.1998). The subjective component can be satisfied by the alien's credible testimony of his fear of persecution. *Id.* The objective component can be satisfied through "credible direct and specific evidence in the record ... that would support a reasonable fear of persecution." *Id.* (alteration in original) (citation omitted). This showing can be made by demonstrating past persecution because an alien suffering from past persecution is entitled to a presumption of having a well-founded fear of future persecution. *Id.* at 967.

Singh argues that the IJ's credibility finding is not supported by substantial evidence because apparent inconsistencies do not exist and the reasons given are not cogent. In particular Singh contends that he explained why his application was in error about the date of his second arrest and why he did not wear a cast at the funeral. He maintains that the fact that injury is not visible in the photograph does not negate its existence. He also points out that he saw Mann on two occasions, one of which was after the election and not necessarily inconsistent with the fact that Mann was imprisoned. Further, Singh submits that he should not have been found incredible just because he was not politically articulate or could not remember the dates of various aspects of the factual basis of his asylum claim. Finally,

Singh argues that the IJ's criticisms of the Aggarwal Clinic letter are misplaced as there is nothing extraordinary about a doctor writing a letter in English or describing only his 1990 injuries.

■ We must uphold the IJ's findings of fact as "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B) (2000); *see also INS v. Elias–Zacarias,* 502 U.S. 478, 481 & n. 1, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992) (holding similarly under now repealed 8 U.S.C. § 1105a(a)(4)). We review adverse credibility findings "under the same highly deferential substantial evidence standard applicable to the denial of asylum." *Lata v. INS,* 204 F.3d 1241, 1245 (9th Cir.2000). However, the IJ must provide specific, cogent reasons for reaching an adverse credibility determination, *see, e.g., Alvarez–Santos v. INS,* 332 F.3d 1245, 1254 (9th Cir.2003), and minor inconsistencies or factual omissions that do not go to the heart of the asylum claim are insufficient to support it. *See, e.g., Vilorio–Lopez v. INS,* 852 F.2d 1137, 1142 (9th Cir.1988).

■ We cannot say that any reasonable adjudicator would be compelled to conclude that Singh's testimony was credible. Singh's testimony that he was in hiding from 1990–1995 was inconsistent with his testimony that he was still in charge of the family farm; Singh got the date of his 1990 arrest wrong on his asylum application; Singh testified that he saw Mann at a time when the country report indicates that Mann was in custody; Singh knew little about the party and could not articulate what kind of work he did for the Akali Dal Mann group; Singh did not participate in elections even though establishing a separate state through the electoral process was the objective of the alleged political

activity upon which his asylum claim is based; and Singh incorrectly stated that the Mann group was the only faction not aligned with the government in 1989. Singh's explanations do not account for the implausibility of his being so actively involved in the Akali Dal and the cause of Khalistan that he was persecuted for it. Nor would a reasonable factfinder be compelled to find that the documentary evidence established Singh's eligibility for asylum. The original funeral photograph which the IJ examined did not show injuries of the sort to which Singh testified. While the Aggarwal Clinic letter buttresses Singh's testimony that he was treated for injuries in 1990, the fact that it appears back-dated yet fails to mention Singh's 1995 treatment by the same doctor supports the IJ's skepticism about its value. The death certificate of Singh's father shows the date of his death, but indicates nothing else that is helpful to Singh's position.

■ Finally, we share the dissent's concern that the record should reflect an accurate translation and a faithful transcription of the proceedings. But the dissatisfied party bears the burden of ensuring that translations and their transcription are correct and, if they are not, of properly raising the issue to the reviewing body or court. Singh, through counsel, commented on the translation to the BIA but did not identify any specific response as inaccurate or request that the matter be remanded for clarification. In our court, as the dissent acknowledges, Singh does not challenge the accuracy of the translation, but, in a footnote, suggests that the transcription was problematic. He neither contests any particular portion of the transcript, nor asks the court to remand the matter for clarification.[1] Although the standard

---

1. In any event, we lack jurisdiction to review this separate question intimated by the dissent, *viz.,* whether the transcription in this

case violated Singh's due process rights. Singh never raised any faulty transcription

for remand for clarification is high, it is attainable: "In the case of an incompetent translation claim, the standard is whether 'a better translation would have made a difference in the outcome of the hearing.'" *Perez–Lastor v. INS,* 208 F.3d 773, 780 (9th Cir.2000) (citation omitted). Given the numerous specific points on which the IJ found Singh's testimony not credible, including testimony that was neither confusing nor unintelligible, we cannot conclude that a better translation would have made any difference in the hearing's outcome.

Absent credible testimony that he was persecuted, Singh failed to establish past persecution or a well-founded fear of future persecution.

PETITION DENIED.

MICHAEL DALY HAWKINS, Circuit Judge, dissenting:

Asylum cases, by their very nature, are difficult to review. The claims relate to events in faraway places, often described by individuals who speak an unfamiliar language, and rarely, if ever, does the government present evidence. The asylum seeker's testimony is often the sole basis for decision, and the hearing transcript, in turn, provides the sole basis for our review. 8 U.S.C. § 1252(b)(4)(A). That record becomes all the more important where the BIA, pursuant to its "streamlining" procedures, provides no analysis for its decision.

Because an adequate record is so essential to meaningful review, we as an appellate body must insist on a record that is properly translated and transcribed. Because this record cannot even charitably be described as adequate, I believe the proper course would be to grant the petition for review and remand the transcript

issue before the BIA. Accordingly, 8 U.S.C. § 1252(d)(1) bars us, for lack of subject-matter jurisdiction, from reaching the merits of a

for clarification. Although Singh does not specifically argue translation on appeal, he presented the argument to the BIA and has therefore preserved the issue for our review. *See Agyeman v. INS,* 296 F.3d 871, 877 (9th Cir.2002).

### I.

We are asked to review the IJ's decision that Singh was not credible using only the administrative record certified to this court on appeal. *See Fisher v. INS,* 79 F.3d 955, 963 (9th Cir.1996) (en banc). Singh's hearing took place over two days, and two different translators were used to guide the Petitioner through questioning in his native Punjabi dialect. Following the close of evidence, the IJ determined that Singh lacked credibility, in part because he "ha[d] not been able to articulate what type of work he allegedly did for the Akali Dal Mann Group. He was vague and non-specific as to what he did, [how] often he did it, or where he did any of this."

As a preliminary matter, "[g]eneralized statements that do not identify specific examples of evasiveness or contradiction" are insufficient to support an adverse credibility determination. *Garrovillas v. INS,* 156 F.3d 1010, 1013 (9th Cir.1998). This particular determination by the IJ alleges neither evasiveness nor discrepancy; the IJ simply faults the Petitioner for what is, in truth, very confusing testimony. Given the obvious problems in translation throughout the transcript, this seems a very tenuous basis on which to question credibility.

Particularly troublesome are the following representative examples. This ex-

legal claim not raised in administrative proceedings below. *Barron v. Ashcroft,* 358 F.3d 674, 678 (9th Cir.2004).

change reportedly took place with regard to Singh's role in the 1989 election:

Q: What was the election for in 1989?

A: Elections for Parliament were had in our area.

Q: And what—what did you do? What was your role?

A: Mostly, I would do it in my spare time—community kitchen (indiscernible).

Q: And what was—how did this support—or how was this connected with the election?

A: People used to get together so I would do an activity for them.

Q: Okay. What was the purpose of the gathering?

A: When people would come to (indiscernible)—they come to the Sikh temple and then they leave.

The record is no better when Singh was asked how often he would work for the Akali Dal Mann Group ("Mann group"):

Q: How often did you do this?

A: Whenever seniors would come and talk to us.

Q: Do you think you could give a more definite time. Would you say it was once a year, for example?

A: Like when gathering for the busiest ceremony to commemorate that was only of the (indiscernible).

Q: Is this in some way connected with the Akali Dal activities?

A: But they got (indiscernible) and (indiscernible) religious place and people at (indiscernible) to gather there.

Q: You mentioned you went out to villages and would tell people about the Akali Dal. Was there any particular occasion that this would come up?

A: They will say that this is doing (indiscernible) excesses but if we work together then it could help us.

\* \* \*

Q: Right after the time that your cousin-brother, Karamgit was arrested and killed by the police, how may times do you think you helped set up for functions?

A: Used to work on December 25 when I daily got together in the memory of the son of the guru, I used to do when I worked there.

Q: So, that would be once a year. Did you do anything else politically at the time?

A: Yes, the seniors would come to (indiscernible) temples in the villages and then I used to ask people to get together there.

Q: Do you think you might do this once a year in addition to your helping on December 25th or how often do you think it was?

A: No, after about a month, when the seniors told me, then I would go to the villages.[1]

We do not know whether these problems are the result of inadequate translation or faulty transcription. Whatever the cause, one thing is clear: Singh's testimony is replete with disjointed and nonsensical statements that should not be sufficient for a credibility determination that Singh was "vague" and "unspecific" about his participation in the Mann group. *See Perez–Lastor v. INS*, 208 F.3d 773, 778 (9th Cir.2000) (Incorrectly translated words are "direct evidence" of an incompetent translation and "unresponsive answers by the witness provide circumstantial evidence of translation problems.") (citing *Kovac v.*

---

**1.** This is a representative excerpt of the hearing's testimony—the term "indiscernible" appears in the transcript some 73 times.

*INS*, 407 F.2d 102, 108 n. 12 (9th Cir.1969), and *Acewicz v. INS*, 984 F.2d 1056, 1063 (9th Cir.1993)).

Perceived inconsistencies and evasiveness that are the result of faulty or unreliable translation may not be sufficient to support a negative credibility finding. *See He v. Ashcroft*, 328 F.3d 593, 598 (9th Cir.2003). Similarly, vague testimony caused by transcription problems should not be faulted.[2] For all we know, the specificity of Singh's testimony was quite literally lost in translation, and no one— not the IJ, the government lawyer, or even Singh's own attorney—acted to rectify the confusion.[3] *Cf. Kotasz*, 31 F.3d at 850 n. 2 (No due process violation where the translation was "at times 'nonsensical'" and where "[c]larification or repetition was at times required, but in each instance the misunderstanding was rectified to the apparent satisfaction of the parties.").

## II.

When this court receives such an indiscernible record on appeal, we should assume that one of two things occurred: either (1) communications occurred at the hearing that were not recorded in the transcript, giving the IJ a greater modicum of clarity as to the applicant's testimony than is reflected in the transcript, or (2) the "cloudy" transcription is a verbatim account of what actually occurred. In the former case, we as a reviewing body cannot properly conduct an informed review based on unrecorded communications that may have fleshed out the merits *vel non* of the petitioner's asylum claim. In the latter case, we should question whether the IJ had a full understanding of what the petitioner said or attempted to say in his testimony. *See Amadou v. INS*, 226 F.3d 724, 727 (6th Cir.2000) (Immigration Judge put on notice of interpretation problems by unresponsive and "indiscernible" answers). In either case, the right of the petitioner to fully present his case for relief is prejudiced where the IJ relies on the faulty transcript as the basis for his or her opinion. 8 U.S.C. § 1229a(b)(4)(B). *See also Cano–Merida v. INS*, 311 F.3d 960, 964 (9th Cir.2002) (Fifth Amendment due process requires a reasonable opportunity to present evidence on applicant's own behalf).

On appeal, such a faulty transcript confounds the predicate rationale for administrative deference in the first place. *See Mendoza Manimbao v. Ashcroft*, 329 F.3d 655, 662 (9th Cir.2003) (An appellate body is simply unable to distill the dynamics of

---

**2.** It is important to note that were this finding the only basis for the IJ's credibility determination, it is quite likely that Singh would have a due process claim. This court has recognized that the right to competent translation is required by due process in the immigration hearing context. *He v. Ashcroft*, 328 F.3d at 598; *see also Kotasz v. INS*, 31 F.3d 847, 850 n. 2 (9th Cir.1994) ("In order to make out a due process violation, ... the alien must show that a better translation would have made a difference in the outcome of the hearing.") (internal quotations omitted).

**3.** More often than not, the lawyers proceeded with questions as if Singh had given a remotely intelligible answer. For example the following exchange regarding the 1990 arrest, in which petitioner's attorney doesn't skip a beat despite his clients nonresponsive answers, implies that those present were privy to a greater degree of clarification than is reflected in the transcript:

Q: How were you helping in the elections that they considered was against the government?
A: We had helped someone (indiscernible).
Q: How did you help him?
A: We had got work (phonetic sp.) in his favor.
Q: Did you do anything else to help the Mann candidacy?
A: Just had caused work for him.
Q. Now what—what did the police do with you and your father once you were arrested?

an interview, observe whether words were interpreted properly, whether there was hesitation or whether the supposed inconsistency ... was a matter of misinterpretation, confusion, or a true inconsistency."). Where the record of the hearing is replete with translation errors such that we are unable to decipher what in fact went on below, this court cannot possibly make an informed judgment with regard to substantial evidence.

In such a case, I believe that remand to the IJ for clarification of translation is appropriate. If the IJ cannot correct the record to reflect actual events in the hearing, then the faulty translation essentially amounts to a denial of judicial review guaranteed by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"). *See generally,* 8 U.S.C. § 1252(b). This is especially true because our review is limited solely to the information in the administrative record. *See Fisher,* 79 F.3d at 963.

The language of IIRIRA and its implementing regulations are instructive. Under 8 U.S.C. § 1229a(b)(4)(C), one of an applicant's "rights" in his immigration proceeding is that "a complete record shall be kept of all testimony and evidence produced at the proceeding." IIRIRA's implementing regulations make clear that it is the responsibility of the Immigration Judge to "create and control" the record of the proceeding, 8 C.F.R. § 1003.36, as only the Immigration Court has "custodial responsibility" for immigration proceedings. 8 C.F.R. §§ 1003.11, 1003.13 (defining "administrative control" as "custodial responsibility for the Record of Proceeding as specified in 1003.11."). This task does not end with the termination of the hearing or the certification of the translation by the transcriber. It is the ultimate responsibility of the IJ to create and preserve a record upon which this court can make a thorough and adequate judgment.

Placement of this responsibility on Immigration Judges is consistent with our cases recognizing that faulty translation cannot be the basis for an adverse credibility determination. *He,* 328 F.3d at 598. Faulty translation is particularly relevant in this context because often, "incompetent translation prevent[s] [the petitioner] from presenting relevant evidence ... caus[ing] the BIA to find that his testimony was not credible." *Perez–Lastor,* 208 F.3d at 777–78. The same logic applies to review by a court of appeals. Indeed, if the translation is egregious enough, it amounts to a deprivation of due process. In *Perez–Lastor,* we explained that "an incorrect or incompetent translation is the functional equivalent of no translation: the alien must be able to understand the question posed to him and to communicate his answer to the IJ." *Id.* at 778, *citing Hartooni v. INS,* 21 F.3d 336, 340 (9th Cir.1994), and *Augustin v. Sava,* 735 F.2d 32, 37 (2d Cir.1984).

Remand is also consistent with the treatment given to records on appeal from district court by the Federal Rules of Appellate Procedure. Under Rule 10(e), "[i]f any difference arises about whether the record truly discloses what occurred in the district court, the difference must be submitted to and settled by that court and the record conformed accordingly."

Fed. R.App. P. 10(e). The burden of producing an *accurate* record on appeal is placed squarely with the court, not the parties. It is however, the burden of the parties to order, compose, and file the record with the court of appeals. Only in this regard do the rules vary for appeals of administrative orders—under Rule 17, the burden of producing and filing the record is placed on the agency, not the parties. Fed. R.App. P. 17(a). The special rules with regard to agencies do not, however, alter the general rule that mistakes or questions about the accuracy of the record

must be settled by the lower court and not the parties. *See, e.g.,* Fed. R.App. P. 15–20.

The BIA has required no less of its Immigration Judges in the analogous circumstance of an asylum interview. In *In re S–S,* 21 I. & N. Dec. 121 (BIA 1995), the en banc BIA held that when "the applicant's credibility is placed in issue because of alleged statements made at the asylum interview, our review requires a reliable record of what transpired at that interview." 21 I. & N. Dec. at 133–34. In that case, the record of the initial asylum interview was "randomly organized, cryptic to all but the note-taker, and partially illegible." *Id.* at 123. As a result, the BIA remanded the record to the immigration director, holding that "[a]t a minimum, the record must contain a meaningful, clear, and reliable summary of the statements made by the applicant...." *Id.* at 124. The BIA also noted that "[t]his record will also be indispensible to the applicant in preparing his rebuttal to the notice of intent to deny, and in making his arguments on appeal." *Id.* Notes "cryptic to all but the note-taker, and partially illegible" in the interview setting are logically analogous to a hearing transcript that is vague, confusing and indiscernible in some places to all but possibly those initially present at the hearing.

### III.

Until IJs are told, in no uncertain terms, that they are responsible for the production of an understandable record, we will continue to receive transcripts of hearings like this one. The buck must stop somewhere. When this court receives a record on appeal from which it is difficult or impossible to discern what actually went on in the proceeding, we can only assume that the IJ was similarly affected by either faulty transcription or bad translation, creating prejudice to the applicant. Accordingly, I would grant the petition for review and remand to the BIA to direct the IJ to either produce a legible transcript or grant Singh a new hearing. Only from a complete and understandable record can we provide meaningful judicial review.