**LIPING ZHENG, Petitioner,**

v.

**Michael B. MUKASEY, Attorney General, Respondent.**

No. 05–71455.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 6, 2008.

Filed July 22, 2008.

Melanie M. Yang, Law Offices of Melanie M. Yang, San Gabriel, CA, for Petitioner.

CAC–District Counsel, Office of the District Counsel Department of Homeland Security, Los Angeles, CA, Ronald E. Lefevre, Office of the District Counsel, Department of Homeland Security, San Francisco, CA, Pierre R. St. Hilaire, U.S. Department of Justice, Criminal/Antiterrorism Section, Yamileth G. Handuber, M. Jocelyn Lopez Wright, U.S. Department of Justice, Civil Division/Office of Immigration Litigation, Washington, DC, for Respondent.

Before: CANBY, BYBEE, and M. SMITH, Circuit Judges.

MEMORANDUM *

Petitioner Liping Zheng, a Chinese national, was charged with removability for

---

* This disposition is not appropriate for publication and is not precedent except as provided by 9th Cir. R. 36–3.

being an alien present in the United States without admission or parole. She conceded removability, but applied for asylum, withholding of removal, and relief under the United Nations Convention Against Torture ("CAT") on the theory that she would be persecuted and tortured because of her religion if she were removed to China. The Immigration Judge ("IJ") denied the asylum application as untimely and denied the other applications on the merits. The Board of Immigration Appeals ("BIA") affirmed. Because the BIA adopted the reasoning of the IJ, we review the IJ's decision for substantial evidence, *Hakeem v. INS*, 273 F.3d 812, 816 (9th Cir.2001), and must deny the petition if the IJ provided "specific, cogent reasons" for her decision, *Singh v. Ashcroft*, 367 F.3d 1139, 1143 (9th Cir.2004). Addressing only the application for withholding of removal,[1] we grant the petition for review and remand.

## I.

Zheng argues that the BIA violated her right to due process by summarily adopting the IJ's finding that the asylum application was untimely. The argument is unpersuasive. Affirmance by adoption does not violate due process. *See Falcon Carriche v. Ashcroft*, 350 F.3d 845, 851 (9th Cir.2003); *Alaelua v. INS*, 45 F.3d 1379, 1381–82 (9th Cir.1995).

## II.

Zheng next argues that the adverse credibility determination underlying the denial of withholding of removal is not supported by substantial evidence. We agree. The IJ found that Zheng lacked credibility for several reasons, but none of them are cogent. *Singh*, 367 F.3d at 1143.

---

1. We lack jurisdiction to review the IJ's decision on the application for asylum, 8 U.S.C.

## A.

█ The IJ found that Zheng was not credible in part because she purportedly testified that "the person who accompanied her and smuggled her here ... took [her] passports and all the documents," and yet she "was able to somehow have a boarding pass in a false name" at the time of the asylum hearing. This finding is not supported by the record. Zheng never testified that someone accompanied her to the United States, or that such a person took both the passport and *all* other documents in her possession. She simply testified that upon her arrival in San Francisco an individual named Mr. Lin took the false passport. Zheng's possession of the ticket stub at the asylum hearing was consistent with this testimony.

## B.

The adverse credibility determination was also based on Zheng's hospital records. According to the IJ, the records are inconsistent because (1) one states that Zheng had a miscarriage on November 21, 2001, while another states that she had an abortion only a week later on November 28, and (2) they bear different official stamps. Given the record before the IJ, neither of these reasons is persuasive.

## 1.

█ The IJ's first reason cannot constitute substantial evidence because it rested on personal speculation. *Kaur v. Ashcroft*, 379 F.3d 876, 887 (9th Cir.2004). The IJ appears to have assumed that the records describe what is known as a "complete miscarriage," or one in which the "embryo or products of conception have emptied out of the uterus" and bleeding "subside[s]

---

§ 1158(a)(2)(B) & (a)(3), and Zheng does not appeal the adjudication of her CAT claim.

quickly." Am. Pregnancy Ass'n, Miscarriage, http://www.americanpregnancy.org/pregnancycomplications/miscarriage.html (last visited May 6, 2008). If Zheng's uterus had emptied completely on November 21, it would have been impossible for her to have an abortion only a week later. But there was no basis for assuming that is what occurred. There are various types of miscarriages, only some of which involve the complete and unassisted expulsion of the "products of conception" within a short period. *See id.* ("Miscarriage is often a process and not a single event. There are many different stages or types of miscarriage."). The medical documents themselves are silent on the precise nature of Zheng's condition, and the IJ was not qualified to determine independently that one type of miscarriage had occurred rather than another.

The IJ's speculation was particularly problematic because it ignored Zheng's explanation for the purported inconsistency in the records. *See Kaur*, 379 F.3d at 887 ("An adverse credibility finding is improper when an IJ fails to address a petitioner's explanation for a discrepancy or inconsistency."). Zheng testified that she suffered continuous bleeding from her uterus after the beating and had an abortion involving a "suction" procedure on November 28th once it became apparent that the baby could not be saved. The IJ never addressed this testimony. This oversight is significant because Zheng's testimony is consistent with the conclusion that her beating induced what is known as an "incomplete miscarriage," and that she underwent the "abortion" on November 28th to treat that condition. *See* Am. Pregnancy Ass'n (incomplete miscarriage may involve persistent bleeding and may be treated with dilation and curettage); *see also* Merck Manual of Diagnosis & Therapy 2199–2201 (Mark H. Beers ed., 2006) (describing various types of miscar-

riages and their corresponding treatments); Am. Med. Ass'n Encyclopedia of Med. 690 (Charles B. Clayman ed., 1989) ("If a miscarriage is incomplete or inevitable and bleeding is heavy, a *D and C* (scraping out of the uterus) may be required.").

### 2.

■ The IJ's conclusion that the medical records are suspect because they bear dissimilar stamps is also unpersuasive. The English translations of the records consistently state that Zheng stayed at the "Changle Hospital" or "Changle City Hospital." Moreover, the IJ failed to address Zheng's explanation that the stamps differed only because they came from separate units within the hospital. *See Kaur*, 379 F.3d at 887 ("An adverse credibility finding is improper when an IJ fails to address a petitioner's explanation for a discrepancy or inconsistency.").

### C.

The adverse credibility determination also relied on the IJ's findings that (1) Zheng could not recall the name of her current pastor or the location of the church she attends, and (2) could not recall "what happened between" the Old Testament and New Testament. Again, neither of these constitutes substantial evidence. *Singh*, 367 F.3d at 1143.

■ The IJ's first finding is unpersuasive because nothing in the record suggests that Zheng did not know the location of her church. Zheng testified that she attended the "Salvation Army Church," but counsel never questioned her about its location. Additionally, while it is true that she was unable to recall the name of her pastor, that fact cannot support the IJ's determination because it is only tangentially related to the circumstances of Zheng's

persecution in China. *See id.* ("[M]inor inconsistencies or factual omissions that do not go to the heart of the asylum claim are insufficient to support" an adverse credibility determination.).[2]

■ The IJ's second finding is also unpersuasive. That Zheng could not recall "what happened between"[3] the Old Testament and the New Testament does not "go to the heart" of her asylum claim. *Id.* Moreover, Zheng's knowledge of Christianity was clearly sufficient to support her story. She testified of learning that Jesus "saved the children and healed the sick," that the Bible is divided into the New Testament and the Old Testament, and that the first book of the Old Testament is Genesis. She also testified about her belief that Jesus was buried in the "olive mountain," apparently a reference to the "Mount of Olives." These answers displayed a level of exposure to Christianity that would be very difficult to explain if Zheng were not herself a believer.

### D.

■ The final basis for the IJ's adverse credibility determination was Zheng's demeanor during the asylum hearing. The IJ found that Zheng was "hesitant, particularly on cross examination in responding to some questions." Credibility determinations based on demeanor are entitled to "special deference," *Singh–Kaur v. INS,* 183 F.3d 1147, 1151 (9th Cir.1999), but we cannot conclude that Zheng's demeanor constitutes substantial evidence. Given her ability to consistently recount rather

detailed facts pertaining to her persecution in China, the variety of documents that appear to support her story, and her apparent willingness to answer all of the questions posed during cross-examination, the mere fact that she was "hesitant" while responding to the government's questions is not a cogent basis for an adverse credibility determination.

### III.

Zheng next argues that the IJ erred in finding her ineligible for withholding of removal. To qualify, Zheng was required to show that it is "more likely than not" that her life or freedom would be threatened in China on account of her religion. *Hanna v. Keisler,* 506 F.3d 933, 939 (9th Cir.2007). She is presumptively eligible for relief if she shows through credible testimony—and, if necessary, other corroborating evidence—that she suffered past persecution. 8 C.F.R. § 208.16(b). The IJ found that Zheng failed to establish past persecution for the following reasons: (1) she is not credible; (2) her husband, child, and mother remain in China unharmed; (3) she stayed in China for over two months after her release from detention and nothing further happened to her during that period; and (4) a 2002 State Department Country Report explains that the Chinese government usually does not persecute small house churches that maintain a low profile. We conclude that the denial of withholding of removal is not supported by substantial evidence.

---

**2.** Since the passage of the Real ID Act of 2005, Pub. L No. 109–13, 119 Stat. 231 (May 11, 2005), weaknesses in the alien's testimony need not go to the heart of the claim to constitute substantial evidence. *See Jibril v. Gonzales,* 423 F.3d 1129, 1138 n. 1 (9th Cir. 2005). However, we apply the law as it existed prior to the Real ID Act because Zheng filed her applications before May 11, 2005.

*See* Pub.L. No. 109–13, div. B, § 101(h)(2), 119 Stat. 231, 305.

**3.** We note that the interregnum between the end of the Old Testament and the start of the New Testament is approximately four hundred years. It is unclear what aspects of this history the IJ expected Zheng to recount.

## A.

Because we have concluded that substantial evidence did not support the adverse credibility determination, *see supra* pp. 3–8, that determination cannot in turn support the denial of withholding of removal.

## B.

■ That Zheng's family has remained in China unharmed is not a cogent reason for denying the application. Zheng testified that her husband is not Christian, and there is no indication that her son or mother converted. Accordingly, there is no reason to believe that the government would persecute them on account of religion.

## C.

■ The IJ's finding that nothing further happened to Zheng from the date of her release from detention to the date of her departure to San Francisco is also unpersuasive. The finding ignores Zheng's testimony that the government shut down her motel because of her religious activities. That action deprived Zheng of her primary source of income up to the time she left for the United States. Moreover, whether Zheng suffered additional harm after her detention and beating is irrelevant to whether Zheng has established presumptive eligibility for withholding of removal on the basis of past persecution. Even if she had suffered no further persecution during the brief period from November 2001 to January 2002, that does not negate that she was detained and beaten, and the detention and beating alone would satisfy Zheng's initial burden under 8 C.F.R. § 208.16(b)(1)(i).

## D.

■ The State Department's 2002 Country Report also does not offer sub-

stantial evidence. The passage that the IJ referred to states:

> [M]any small 'family churches,' generally made up of family members and friends, that conducted activities similar to those of home Bible study groups, usually were tolerated by the authorities [in 2002] as long as they remained small and unobtrusive. Family churches reportedly encountered difficulties when their memberships became too large, when they arranged for the use of facilities for the specific purpose of conducting religious activities, or when they forged links with other unregistered groups.

U.S. Dep't of State, Country Reports on Human Rights Practices: China (2002), *available at:* http://www.state.gov/g/drl/rls/hrrpt/2002/18239.htm (last visited May 7, 2008). This passage establishes only that the government "usually" tolerates small unregistered groups such as Zheng's. Such a general and qualified statement cannot justify rejecting Zheng's specific testimony of persecution and the various corroborating documents. *Cf. Almaghzar v. Gonzales,* 457 F.3d 915, 922–23 (9th Cir.2006) (concluding that a State Department report's general description of conditions in a country did not compel the conclusion that those conditions had been experienced by the individual petitioner). Moreover, the Country Report generally supports the credibility of Zheng's story in documenting a variety of limitations on religious freedom in China in 2002. The Report states that "government respect for religious freedom remained poor," that "crackdowns against unregistered groups, including underground Protestant and Catholic Groups . . . continued," that police closed "scores" of house churches, and that leaders of unauthorized groups were "sometimes targets of harassment, interro-

gations, detention, and physical abuse." The Report also notes a police raid on a house church in Fujian Province. Taken together with Zheng's other evidence, the Country Report is an unpersuasive basis for concluding that past persecution did not occur.

The petition for review is GRANTED. The case is REMANDED for further proceedings consistent with this memorandum disposition.