**Wenda GE, Petitioner,**

v.

**John ASHCROFT, Attorney General, Respondent.**

**No. 02–73700.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 2, 2004.

Filed May 13, 2004.

Franklin W. Nelson, San Gabriel, CA, for the petitioner.

John Andre, United States Department of Justice, Civil Division, Washington, DC, for the respondent.

Before PREGERSON, BEEZER, and TALLMAN, Circuit Judges.

BEEZER, Circuit Judge:

Petitioner Wenda Ge, a native and citizen of the People's Republic of China, appeals a decision of the Board of Immigration Appeals ("BIA") affirming, without opinion, an Immigration Judge's ("IJ") decision to deny petitioner's application for asylum and withholding of removal. Ge contends that he is a victim of China's coercive population control program, and thus a refugee eligible for asylum under Section 101(a)(42)(B) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101(a)(42)(B). Ge also asserts that he is entitled to withholding of removal. *See* 8 U.S.C. § 1231(b)(3).

Specifically, Ge asserts that Chinese authorities forced his wife to undergo three abortions following unauthorized and unplanned pregnancies. Ge claims that during his wife's third unauthorized pregnancy, he was detained, interrogated, and beaten when his wife failed to appear for a mandatory physical examination. Ge also claims that both he and his wife lost their jobs at a government-owned shipping company because they violated China's one-child policy, and that Chinese authorities threatened both Ge and his wife with sterilization.

The IJ denied asylum and withholding of removal based on an adverse credibility determination. Ge argues that the credibility determination is not supported by substantial evidence in the record. We agree, and grant review. We reverse the IJ's adverse credibility determination and hold that Ge is a refugee eligible for asylum by statute. We remand to the BIA for an exercise of the Attorney General's discretion whether to grant asylum. On remand, the BIA shall determine, after crediting Ge's testimony, whether he is entitled to withholding of removal.

I

Ge is a 43–year–old native and citizen of China. Ge is married and has one son, who is now sixteen years old. His wife and son currently reside in China.

Ge holds a university degree in shipping and worked for several years for the government-owned Shanghai Sun Jai Shipping Company. He started as an "ordinary worker," but eventually became a Department Manager. Ge's wife was also employed by the same shipping company as a factory worker.

In late 1991, four years after the birth of her first son, Ge's wife became pregnant despite the fact that she had been fitted with an intrauterine device ("IUD"). Ge

testified that in late March 1992, local authorities forced his wife to have an abortion. According to Ge, his wife was "dragged from[the] factory [where she worked] to the hospital to have an abortion." The Ges were not subjected to further punishment or a fine for the first unauthorized pregnancy.

Ge asserts that in 1996, his wife became pregnant again, despite her continued use of an IUD, and was forced to have a second abortion. The second unauthorized pregnancy was discovered during a routine bimonthly exam given to women at the workplace to detect pregnancy. This time, the local authorities no longer believed that the pregnancy was a mistake, but assumed that the Ges had deliberately violated the one-child policy. Ge testified that because of the second illegal pregnancy, he was asked to resign from his job and his wife was forced to "step down" as well. Thereafter, Ge's wife received a small stipend from the shipping company.

Ge testified that both he and his wife had trouble finding work after leaving the shipping company because their records contained notations indicating that they had violated the one-child policy. For the next two years, the Ge family lived on savings and with financial help from parents, friends and siblings.

After two years of looking for work, Ge decided to open his own restaurant. Ge testified that he received help from a college friend who was living in Hong Kong at the time. This friend encouraged Ge to travel to Hong Kong to learn about the restaurant business and offered to pay Ge's way. Ge testified that the friend knew several people who owned restaurants in Hong Kong. Ge's friend arranged and paid for Ge's travel to Hong Kong through a university travel agent, and Ge traveled as part of a tour with a Shanghai youth group. The travel itinerary for the group was from China to Thailand, Hong Kong, the Seychelles, and then back to Hong Kong. Ge opened a small restaurant in Shanghai in March 1998 with funds he had borrowed. Ge's wife worked at the restaurant.

In April 1999, Ge's wife discovered that she was pregnant again, despite continued use of the IUD. Ge and his wife feared that she would be forced to undergo a third abortion, so she went to a village "to hide." She then missed her regular medical examination at the factory. Ge testified that his wife had to continue reporting to the factory for the exams even after she was forced to step down from her position because she continued to receive a monthly stipend and because "her file [was] there."

After Ge's wife missed the exam, two women, one from the family planning unit of the shipping company and one from the district committee, provided notice to Ge that he had three days to produce his wife for the physical. Ge was told that if he did not produce his wife, his restaurant would be closed. Ge's wife remained in hiding and did not report for the physical.

Ge testified that on May 6, 1999, four people, one from the factory, two from the district and one from the police, came to his restaurant. They locked up the restaurant and took Ge into custody. At that time, Ge's mother took Ge's son to stay with her and Ge's father. Ge testified that he was detained at the district committee detention center. Ge said that officials accused him of violating the family planning policy, kicked and hit him, and asked him to write a confession. Ge testified that he did not feel that he had done anything wrong. He testified that he had not deliberately violated the family planning policy because his wife's pregnancy was an accident. Ge also testified that he did not think his wife could endure another abortion and that he considered abortion inconsistent with his Buddhist faith.

Ge testified that he remained locked in a room at the detention center for three days. He claimed that he escaped through a bathroom window. Ge testified that a guard would accompany him to the restroom, which was in a nearby building. Ge told the guards that he had stomach upset and requested frequent trips to the restroom. Initially, the guards accompanied him all the way to the restroom, but eventually they allowed Ge to go the restroom building on his own, and simply watched from a nearby building. Ge went to the restroom unaccompanied and returned about three times before he escaped through a restroom window during one of his visits. Ge stated that the restroom was used by both detainees and guards and that the restroom window was unlocked and not barred. Ge testified that he went to a friend's house and hid there for just over two months until the friend helped him obtain a visa to the United States. Ge obtained money from his family to pay $8,000 for the visa. He entered the United States on July 21, 1999.

Ge testified that in the fall of 1999, his wife returned to Shanghai to check on her son, who was still staying with Ge's parents. While there, she was detained by the district committee and forced to have a third abortion in October 1999. At that time, she was forty years old and seven months pregnant. Ge testified that when his wife left the hospital after the abortion, she signed a letter promising to return in a month to be sterilized. Ge's wife never returned for the sterilization procedure. Instead, she hid from authorities in a suburb of Sichuan.

Ge stated that because the district committee could not find his wife, committee members sought out his parents. The district committee members warned Ge's parents that if they did not produce Ge or his wife for sterilization within three months, they would "close" or "seal" his house. Ge testified that authorities did, in fact, close his house in April 2000. Ge learned about these events through phone communication with his family subsequent to his arrival in the United States.

Ge stated that if he is forced to return to China, he fears forcible sterilization. He also fears that because he fled, he will be arrested and imprisoned under life-threatening conditions.

The IJ denied Ge's application for asylum and withholding of removal solely on the basis of her adverse credibility determination. The IJ cited over a dozen aspects of Ge's testimony that she found to be "incredible" or "implausible." The IJ did not point to any internal inconsistencies in Ge's testimony or any inconsistencies or contradictions between Ge's testimony and his written asylum application. The BIA affirmed the decision of the IJ without opinion pursuant to 8 C.F.R. § 3.1(e)(4).

## II

Where, as here, the BIA affirms the Immigration Judge's ("IJ's") decision without opinion, we review the decision of the IJ as if it were that of the BIA. *See Cedano–Viera v. Ashcroft,* 324 F.3d 1062, 1063 n. 1 (9th Cir.2003). We review adverse credibility determinations under the substantial evidence standard. *Lopez–Reyes v. INS,* 79 F.3d 908, 911 (9th Cir. 1996). Although this standard is deferential, "[s]peculation and conjecture cannot form the basis of an adverse credibility finding, which must instead be based on substantial evidence." *Shah v. INS,* 220 F.3d 1062, 1071 (9th Cir.2000).

## III

The IJ based her adverse credibility determination on several findings that rest on impermissible speculation and con-

jecture. The majority of the IJ's findings rest on her speculation about what she imagined the Chinese authorities would or would not do under certain circumstances. For example, the IJ did not believe Ge's testimony regarding the loss of his job at the government-owned shipping company after his wife's second unauthorized pregnancy, reasoning that "if the government was so concerned about the respondent's violation of the one-child policy, they [sic] surely would have taken [employment] action against respondent at the time [of the first unauthorized pregnancy]."

The IJ also found it "incredible" that Ge was permitted to open a restaurant after he was terminated from his employment with a government-owned factory for violating the one child policy. The IJ reasoned that "if the government was really concerned about taking punitive action against the respondent, ... they [sic] would not have allowed the respondent to open his own restaurant." The IJ went on to state that she was "inclined to believe that the respondent retired or voluntarily left his position with the shipping company based on the fact that he decided to open up a restaurant."

The IJ deemed incredible Ge's testimony that the government-owned factory where his wife had been employed provided her with a modest monthly stipend when she was forced to step down from her position after a second unauthorized pregnancy. The IJ reasoned, "if the gov-

ernment took such a punitive measure as firing the respondent's wife then why would they [sic] turn around and provide her with a 50 RMB [Renminbi] living allowance ... [?]"[1] The IJ also found it "completely and totally incredible and unbelievable" that Ge's wife "would have to go to her former employer's hospital for a check up every two months" despite the fact that she was asked to step down from her employment at the government-owned factory because of her second unauthorized pregnancy.[2]

The IJ found incredible Ge's testimony that authorities "sealed" his house because he and his wife violated the one-child policy. The IJ hypothesized that the authorities had actually sealed the house because the Ges had abandoned their residence.

All of these findings are based on the IJ's personal conjecture about what Chinese authorities would or would not do. The record lacks evidence upon which an adverse credibility determination can be made. *See Bandari v. INS*, 227 F.3d 1160, 1167–68 (9th Cir.2000) (IJ's belief about the policies of a foreign government amounted to nothing more than conjecture and speculation and was an impermissible basis for an adverse credibility finding); *Lopez–Reyes*, 79 F.3d at 912 (rejecting adverse credibility finding that was based on personal conjecture about what a persecutor "likely would or would not do"); *cf. Wang v. INS*, 352 F.3d 1250, 1255–56 (9th Cir.2003) (IJ's skepticism that "authorities

---

1. Ge testified that at the time, "the policy" of the government-owned company was that a husband and wife could not be fired simultaneously for violating the one-child policy. Instead, one spouse would be fired or forced to resign, and the other would receive no work and the smallest stipend permitted.

2. Ge testified that his wife continued to report for medical exams at the government-owned shipping company because she received a modest stipend from the company and be-

cause "her file [was] there." Ge's testimony is consistent with the U.S. State Department's 1998 Profile of Asylum Claims and Country Conditions for China, which indicates that in Shanghai "local family planners had strict orders to detect all pregnancies before four months had elapsed." The Profile describes a system in which local government and government-owned businesses work hand-in-hand to enforce China's family planning policies.

in[petitioner's] community actually enforced China's 'one-child policy' as vigorously as [petitioner] claimed" did not support an adverse credibility finding.

The IJ also found not credible Ge's testimony that he managed to flee from the neighborhood facility where he was detained. The IJ rested her finding on personal speculation about the security practices and effectiveness of the local officials who guarded Ge in detention. *See Chouchkov v. INS*, 220 F.3d 1077, 1083 (9th Cir.2000) (personal conjecture about the expected efficiency and competence of government officials is not a substitute for substantial evidence). In addition, the IJ stated that her finding was based on "general background information about China and the conditions with regard to its prisons, detention facilities and reeducation camps." To the extent that the IJ was "relying exclusively on blanket statements in a State Department report," the IJ "failed to make the individualized analysis of[the] applicant's credibility that our case law mandates." *Shah*, 220 F.3d at 1069. Further, the IJ's finding rested on her speculation about factors that could not have been known to her, evidenced by such statements as "the Court doesn't believe that there were no bars on the window in the bathroom." Such findings are not based on evidence in the record.

Additional findings by the IJ are based on impermissible speculation about what Ge, his wife, and other people would or would not have done in certain situations. These findings relate to Ge's inability to provide certain information about how he obtained his travel documents and Ge's testimony that a university friend funded his travel to Hong Kong (via other destinations) to learn how to manage a restaurant.

The IJ found that Ge had not presented credible evidence that his wife had undergone an involuntary abortion. Specifically, the IJ found that Ge's wife's third abortion was voluntary after examining a one-page medical report submitted by Ge as evidence that his wife was forced to undergo three abortions.[3] The IJ equated the medical record with a type of document which, according to the State Department's 1998 Country Profile for China, some asylum applicants fraudulently present as an "abortion certificate," but which is generally issued only after a voluntary abortion. There is no evidence in the record that the hospital record submitted by Ge is the type of document described in the State Department report. The document itself does not resemble a certificate. The IJ erroneously assumed that the only type of one-page record Ge could have submitted documenting his wife's abortions was the so-called "abortion certificate" described by the State Department. This non-evidence-based assumption cannot support an adverse credibility finding. *See Wang*, 352 F.3d at 1255 (IJ's disbelief that Chinese hospital would issue a birth certificate for a home birth is not substantial evidence of incredibility); *Shah*, 220 F.3d at 1071 (IJ's subjective view of what a certain type of document would look like is insufficient basis for adverse credibility finding).

In addition, the IJ based her conclusion that the third abortion was voluntary on a vague notation on the medical record which reads, "(no birth quota)." The IJ interpreted the notation to mean that Ge's wife was not constrained by the one-child policy. Again, the IJ's finding was based

---

**3.** The medical report is titled "Self-hold Outpatient Service Record Card." It notes Ge's wife's age of 40 and states a diagnosis of "pregnancy with IUD 7–month." The card states, "Implement: Abortion in hospital." It also notes a history of two abortions, stating, "03/92 and 06/96 pregnant with IUD, both aborted plus IUD removal."

on speculation, not substantial evidence in the record.

The IJ found it "highly speculative" that Ge's wife could become pregnant on three occasions while using an IUD. The IJ expressly de-emphasized this finding, reasoning that Ge's wife may have fallen into the 1% of women for whom IUDs are ineffective. To the extent that this finding factored into the IJ's decision, it is factually erroneous and cannot support an adverse credibility determination. *See Paramasamy v. INS,* 295 F.3d 1047, 1052 (9th Cir. 2002). According to the State Department's report, the stainless steel IUDs used in China have an 85% effectiveness rate, as opposed to a 97% effectiveness rate for the copper IUDs used in the United States. Further, whether Ge's wife's pregnancies were intentional or unintentional is irrelevant to our analysis as long as the subsequent abortions were involuntary. *See* 8 U.S.C. § 1101(a)(42)(B).

The IJ found that Ge's credibility was undermined by his attorney's attempt to explain possible translation problems surrounding Ge's testimony that his wife was forced to step down from her position at a government-owned business after a second unauthorized pregnancy. The IJ concluded that the explanation was an attempt to change Ge's testimony. The record does not support this finding. Despite the alleged translation problems, Ge's testimony on this subject is consistent throughout the hearing.

Finally, the IJ found Ge incredible because he did not produce employment records confirming his dates of employment with the government shipping company. Here, such records were not "easily available" because Ge's employer had fired him. *Cf. Sidhu v. INS,* 220 F.3d 1085, 1092 (9th Cir.2000) (adverse credibility determination may be based on failure to produce non-duplicative, material, and easily available corroborating evidence where applicant provides no credible explanation for such failure). Moreover, because Ge provided credible and consistent testimony, no further corroboration is required. *See Salaam v. INS,* 229 F.3d 1234, 1239 (9th Cir.2000).

We find that the IJ's adverse credibility determination is unsupported by substantial evidence and that Ge's testimony is credible. Because we hold that Ge produced credible evidence under the law of this circuit, we accept his testimony as true. *See id.*

**IV**

Pursuant to INA section 101(a)(42)(B) and the BIA's decision in *In re C–Y–Z,* 21 I. & N. Dec. 915, 918–20 (BIA 1997), Ge is automatically eligible for asylum if he can show that his wife was forced to undergo an abortion under China's one-child policy. *See also Ma v. Ashcroft,* 361 F.3d 553, 559 (9th Cir.2004) (internal citations omitted) ("The BIA and the courts have uniformly applied the statute's protections to husbands whose wives have undergone abortions or sterilization procedures, as well as to the wives themselves."); *He v. Ashcroft,* 328 F.3d 593, 604 (9th Cir.2003). Accepting Ge's testimony as true, he has conclusively established past persecution and eligibility for asylum. *Id.* On remand, the BIA shall, on behalf of the Attorney General, exercise discretion regarding whether to grant asylum.

Because the BIA did not consider whether Ge had met the more stringent requirements for withholding of removal, we remand for the BIA to determine, in the first instance, whether there is a clear probability that Ge would be persecuted if returned to China. *See id.*

Review **GRANTED. REMANDED.**