**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ARANGESAN SUNTHARALINKAM,

*Petitioner,*

v.

ALBERTO R. GONZALES, Attorney
General,

*Respondent.*

No. 04-70258

Agency No.
A79-784-825

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
March 10, 2006—Pasadena, California

Filed August 18, 2006

Before: Kim McLane Wardlaw and Johnnie B. Rawlinson,
Circuit Judges, and Richard F. Cebull,* District Judge.

Opinion by Judge Wardlaw;
Dissent by Judge Rawlinson

---

*The Honorable Richard F. Cebull, United States District Judge for the
District of Montana, sitting by designation.

9929

**COUNSEL**

Visuvanathan Rudrakumaran, Law Office of Visuvanathan Rudrakumaran, New York, New York, for the petitioner.

Genevieve Holm (argued) and Cynthia Stone (briefed), U.S. Dept. of Justice, Civil Division, Office of Immigration Litigation, Washington, D.C., for the respondent. Also on brief for the respondent, Lester M. Joseph and Michael E. Davitt, U.S. Dept. of Justice, Criminal Division, Washington, D.C.

**OPINION**

WARDLAW, Circuit Judge:

Arangesan Suntharalinkam's petition for review lies at the intersection of the immigration and counterterrorism laws. Suntharalinkam, a 27-year-old male from northern Sri Lanka, petitions for review of the Board of Immigration Appeals' (BIA) summary affirmance of the immigration judge's (IJ) denial of Suntharalinkam's application for asylum, withholding of removal, and relief under the Convention Against Torture (CAT), 8 C.F.R. §§ 1208.16-1208.18. Suntharalinkam

claims that he was persecuted by the Sri Lankan government because of its incorrect suspicion that he was a member of the Liberation Tigers of Tamil Eelam (LTTE or Tamil Tigers), a terrorist organization at war with the Sri Lankan government; the government, in turn, claims that Suntharalinkam was never persecuted by the government, and is in fact a suspected Tamil Tiger who seeks to enter the United States to further that organization's terrorist activities.

The IJ, apparently convinced by the government's hypothesis, denied relief, but not on any legal ground related to terrorism. Instead, the IJ veiled his concerns about Suntharalinkam's terrorist ties, denying his application for relief based on a contrived adverse credibility finding. The government urges us to ignore the tenuous foundation for the adverse credibility finding, asking us to uphold it as supported by substantial evidence despite the IJ's own statements that the purported "discrepancies" in Suntharalinkam's story are "minor" and individually could not support an adverse credibility finding. We agree with the IJ that none of the supposed "discrepancies" individually provides an adequate basis for his finding. Given that none individually supports the adverse credibility determination, however, the IJ incorrectly found that the "discrepancies" cumulatively support the adverse credibility finding. Although we have some sympathy for the IJ's and the government's suspicion that Petitioner might be a member of a terrorist organization (his tale of persecution by the Sri Lankan government is equally consistent with membership in the Tamil Tigers as it is with merely being suspected of membership), as judges, we are charged with following the law—not our suspicions—and we must, therefore, grant Suntharalinkam's petition and remand to the BIA for consideration of the remaining elements of Suntharalinkam's claims. Having said that, we note that the Department of Homeland Security (DHS) has ample authority to deny admission to a suspected terrorist under both immigration and criminal laws. We therefore remand for further proceedings.

## I.

Suntharalinkam was issued a notice to appear in November 2001 after attempting to enter the United States the previous month using a counterfeit document showing that he was entering the country with a nonimmigrant visa. He conceded both inadmissibility and removability and applied for asylum, withholding of removal, and relief under the Convention Against Torture (CAT), 8 C.F.R. §§ 1208.16-1208.18, claiming that he had been targeted by the government as a result of its false accusation that he was a member of the Tamil Tigers.

Suntharalinkam testified before the IJ that he had suffered abuse at the hands of the Sri Lankan army on three occasions. First, on January 19, 2000, several members of the army entered his home, where Suntharalinkam was with his mother. They assaulted him while his mother was locked in another room. They tied him up, threw him into their military vehicle, and drove him to a military camp, where he was locked in a small room. His detention in the camp lasted for some sixty days. During that time, Suntharalinkam testified, he was stripped and beaten, burned with cigarettes, hung upside down with his head submerged in water, and beaten with an electrical wire. Suntharalinkam showed the IJ scars on his legs that he said were the result of the cigarette burns and electrical wire. He was released after his mother paid a bribe of ten thousand rupees. Suntharalinkam was hospitalized for the next ten days to receive treatment for the injuries he sustained while he was in detention.

Second, Suntharalinkam was detained in August 2000. In the middle of the night, approximately twenty soldiers arrived at his home. Of those, five entered his home and arrested him. He was subsequently detained for five days. Suntharalinkam's asylum application omitted reference to this detention. At the hearing before the IJ, Suntharalinkam testified that his attorney "may have missed it."

Third, in May 2001, when Suntharalinkam was bringing his sister home from school, they were stopped by ten soldiers who asked them for identification and passports. The soldiers asked Suntharalinkam and his sister to accompany them to a camp. Suntharalinkam responded that he was working, and that his sister was a student, but the soldiers accused Suntharalinkam of being a Tamil Tiger and forced them to go to the camp. Suntharalinkam's sister was released the day after the arrest as a result of her school principal's intervention. Suntharalinkam, however, was detained for seventy days. His mother paid another bribe to secure his release. After this third period of detention, Suntharalinkam decided to leave Sri Lanka to avoid further abuse by the Sri Lankan army. He first went to Colombo for ten days, where he made travel arrangements to leave the country.

In support of his application for asylum, withholding, and CAT relief, Suntharalinkam also submitted United States Department of State reports on Sri Lanka for the years 1998 to 2001, which documented large-scale abuses against Tamils by the Sri Lankan government, arbitrary arrests, and torture committed in detention centers. He also provided numerous reports by nongovernmental organizations and news media documenting instances of abuses against Tamils accused of membership in the Tamil Tigers. The government submitted the 2002 State Department country report, which noted that while arbitrary arrest, detention, and targeting of Tamils had been problems in the past, there were no reports of any such abuses occurring during 2002.

In addition, at the hearing before the IJ, the government presented the testimony by stipulation and written memoranda of Senior Special Agent Steven W. Schultz of the Department of Homeland Security (DHS) Joint Terrorism Task Force. Schultz's report was based on conclusions he made about the group of twenty-three Sri Lankan individuals with whom Suntharalinkam had traveled and attempted United States entry. Schultz speculated that the members of the group were not

being persecuted by the Sri Lankan army, as each of them claimed, but instead were members of the Tamil Tigers who were being smuggled in by that group, which relies on alien smuggling as a primary source of income. Agent Schultz noted that the Tamil Tigers have been designated a foreign terrorist organization by the State Department and that individuals who fund the activities of the LTTE are providing material aid to a terrorist organization in violation of United States law.

On August 14, 2003, the IJ denied relief on all three claims after making an adverse credibility finding on the basis of the cumulative effect of what he found to be several inconsistencies. The IJ made special note of his consideration of the testimony and opinions of Agent Schultz in making his decision. The BIA affirmed without opinion on December 17, 2003. Suntharalinkam timely petitioned for review.

## II.

We have jurisdiction over a final order of removal pursuant to 8 U.S.C. § 1252(a)(1). Where, as here, the BIA affirms the IJ's decision without opinion, we review the IJ's decision as the final adjudication on the merits. *See Falcon Carriche v. Ashcroft*, 350 F.3d 845, 849 (9th Cir. 2003).

We review credibility determinations for substantial evidence. *Gui v. INS*, 280 F.3d 1217, 1225 (9th Cir. 2002). Because the IJ is in the best position to assess the applicant's testimony, we defer to the IJ's credibility determination. *See Mendoza Manimbao v. Ashcroft*, 329 F.3d 655, 661-62 (9th Cir. 2003). However, "[w]hile the substantial evidence standard demands deference to the IJ, [w]e do not accept blindly an IJ's conclusion that a petitioner is not credible. Rather, we examine the record to see whether substantial evidence supports that conclusion and determine whether the reasoning employed by the IJ is fatally flawed." *Gui*, 280 F.3d at 1225

(second alteration in original) (internal quotation marks omitted).

**[1]** The IJ must have "a legitimate articulable basis to question the petitioner's credibility, and must offer a specific, cogent reason for any stated disbelief." *Hartooni v. INS*, 21 F.3d 336, 342 (9th Cir. 1994). Any reason for disbelief "must be substantial and bear a legitimate nexus to the finding." *Salaam v. INS*, 229 F.3d 1234, 1238 (9th Cir. 2000) (per curiam) (internal quotation marks omitted). Moreover, "speculation and conjecture cannot form the basis of an adverse credibility finding, which must instead be based on substantial evidence." *Ge v. Ashcroft*, 367 F.3d 1121, 1124 (9th Cir. 2004) (internal quotation marks omitted). As long as one of the IJ's identified reasons for disbelief underlying an adverse credibility finding is supported by substantial evidence and goes to the heart of the claims of persecution, we are bound to accept the negative credibility finding. *Li v. Ashcroft*, 378 F.3d 959, 964 (9th Cir. 2004) (affirming adverse credibility finding even though some grounds were unsupported by the facts or irrelevant).

### III.

### A.

"To determine whether substantial evidence supports the [IJ's] credibility determination, we evaluate each ground cited by the [IJ] for [his] finding." *Wang v. Ashcroft*, 341 F.3d 1015, 1021 (9th Cir. 2003). The IJ identified eight discrepancies that he believed "taken alone, appear minor," but he nevertheless concluded that "when taken in their entirety, they weave a tapestry of inconsistency that simply strains credulity to the breaking point." Because the discrepancies relied upon by the IJ either were not in fact discrepancies; did not go to the heart of Suntharalinkam's petition; placed undue emphasis on the absence of information from Suntharalinkam's asylum application; or relied on unsubstantiated, generalized findings,

and because the IJ did not provide Suntharalinkam an oppor-
tunity to explain those apparent discrepancies that may have
had some connection to his claim for asylum, the IJ's adverse
credibility finding is not supported by substantial evidence.

First, the IJ expressed concern regarding Suntharalinkam's
testimony that he thought he was traveling from Mexico to
Canada rather than to the United States. The IJ opined that it
"strain[ed] credulity" to believe that Suntharalinkam was
unaware of the geography of the three countries, and noted
that "[w]hile this fact, standing alone, is not enough to under-
mine [Suntharalinkam's] credibility, it does call that credibil-
ity into question.

**[2]** This assessment was based on "impermissible specula-
tion and conjecture," and thus cannot support an adverse cred-
ibility finding. *See Ge*, 367 F.3d at 1124. The IJ based his
disbelief on his own unsubstantiated assumptions about Sun-
tharalinkam's knowledge of geography. Suntharalinkam testi-
fied that he had studied Tamil, math, arithmetic, and some
English language in school, and noted that he had never stud-
ied geography and had never learned the location of the
United States or Europe. The IJ said he found it "bizarre" and
"interesting" that Suntharalinkam had not "learned about the
world" during his schooling. This finding rests solely on his
own knowledge of geography and his speculation about what
he imagines a person of Suntharalinkam's background would
and would not know. There is no evidence in the record to
support the IJ's world view. The idea that a person from Sri
Lanka with secondary-school education that did not include
geography classes could not accurately map out the Western
Hemisphere is neither bizarre nor interesting, especially given
studies showing that more than ten percent of 18- to 24-year-
old United States citizens cannot locate the United States on
a map. *See* Bijal P. Trivedi, "Survey Reveals Geographic Illit-
eracy," *National Geographic News*, Nov. 20, 2002.[1] More-

---

[1]This can be found at http://news.nationalgeographic.com/news/2002/
11/1126_021120_TVGeoRoperSurvey.html.

over, at the hearing before us, counsel representing the DHS did not know the answer to the question, "What countries border Sri Lanka?" a lack of knowledge that bears no more upon her credibility than Suntharalinkam's lack of knowledge about North American geography bears upon his. The only basis for the IJ's finding is his own conjecture, which cannot lawfully support an adverse credibility determination. *See Ge*, 367 F.3d at 1124.

Second, the IJ found implausible Suntharalinkam's testimony that he was unaware that his asylum application did not contain the information about his employment history that he discussed at the hearing before the IJ. The IJ noted,

> While at first blush this may seem plausible, the Court notes that the respondent was given ample opportunity prior to the commencement of proceedings to review his application with his attorney for accuracy and completeness. . . . It is implausible, therefore, for the respondent to assert that he was unaware of the omission regarding this employment history in his application. Once again, taken alone, this implausibility and omission from the application does not appear significant as it relates to the respondent[']s overall credibility, but once again, it is a link in the chain.

**[3]** The omitted employment information neither "go[es] to the heart" of Suntharalinkam's claim for relief, nor enhances his claims of persecution, and thus has no bearing on his credibility. *Malhi v. INS*, 336 F.3d 989, 992-93 (9th Cir. 2003); *see also Singh v. Ashcroft*, 362 F.3d 1164, 1171 (9th Cir. 2004); *Wang*, 341 F.3d at 1021; *Shah v. INS*, 220 F.3d 1062, 1068 (9th Cir. 2000). Moreover, "[i]t is well settled that an applicant's testimony is not per se lacking in credibility simply because it includes details that are not set forth in the asylum application." *Lopez-Reyes v. INS*, 79 F.3d 908, 911 (9th Cir. 1996). Contrary to the assertion of the dissent, Suntha-

ralinkam's testimony about his employment history is not "inconsistent with the details of the asylum application." Dissenting Op. at 9957. Instead, it merely included additional details not set forth in the asylum application, and thus does not render his testimony incredible. *Lopez-Reyes*, 79 F.3d at 911. Suntharalinkam does not speak English; he relied on his attorney both to translate the inquiries in the application and to translate his responses. If he failed to communicate this employment information to his attorney, or if he did and the attorney failed to include it, it very well may have been because the information is irrelevant to his claim or to any of the incidents of persecution he describes. The record does not support a finding that the absence of the employment information was not an innocent omission.

**[4]** For this same reason, we reject the IJ's third finding underlying his adverse credibility determination: the omission of Suntharalinkam's August 2000 detention from the asylum application. The IJ described this as "a glaring inconsistency between the respondent[']s testimony and his 'thoroughly reviewed application,' " and he found unconvincing Suntharalinkam's explanation that his attorney "may have missed it." But the IJ had no reason to question Suntharalinkam's explanation, and neither did he have any legitimate basis to consider the omission of the information as bearing on Suntharalinkam's credibility. Because we will not characterize testimony as not credible simply because it includes information in addition to that in the asylum application, *see Aguilera-Cota v. INS*, 914 F.2d 1375, 1382 (9th Cir. 1990), we find that the IJ erred in relying upon this finding.

The dissent relies on *Alvarez-Santos v. INS*, 332 F.3d 1245, 1254 (9th Cir. 2003) in disagreeing with our analysis. The circumstances of *Alvarez-Santos*, however, are distinct, and its holding is thus inapplicable here. At the end of his direct testimony, Alvarez-Santos took a short break. After the break, he was asked by his attorney whether he had anything to add. He then stated that a group of men wearing black and carrying

guns had come to his house to look for him a few days before he fled Guatemala, his native country. He tried to escape, but the men caught him and stabbed him in the shoulder, telling him that they were not going to kill him because they wanted him alive. Alvarez-Santos had not mentioned the stabbing either in his two asylum applications or in his direct testimony. *Id.* at 1248-49. The panel affirmed the IJ's adverse credibility determination, holding that

> [i]t is simply not believable that an applicant for asylum would fail to remember, and thus to include in either of his two asylum applications *or* his principal testimony, a dramatic incident in which he was attacked, stabbed, and fled to the mountains—the very incident that precipitated his flight from Guatemala—only to be reminded of it at the conclusion of his testimony, after taking a break, and, assertedly, because of an itch in his shoulder.

*Id.* at 1254. Here, in contrast, Suntharalinkam credibly explained that his attorney may have accidentally omitted the detention from his application, and he discussed the detention in his principal testimony. He did not claim to have suddenly remembered it, as Alvarez-Santos did; nor did he raise it at the last minute of his hearing. In contrast to *Alvarez-Santos*, the circumstances of Suntharalinkam's discussion of the August 2000 detention are not suspicious in themselves. The dissent's reliance upon this decision is thus misplaced.

**[5]** Fourth, the IJ focused on Suntharalinkam's initial testimony that the soldiers who entered his home in January 2000 had locked "other members of [his] family" in a room, and then later, upon further questioning, explained that only his mother was at home and locked in the room. Because this discrepancy does not "go to the heart" of Suntharalinkam's claim for relief, *Malhi*, 336 F.3d at 992-993, the IJ should not have factored it into the adverse credibility determination. Whether solely Suntharalinkam's mother or other members of the fam-

ily were present when he was assaulted and taken away does not prove or disprove that he was assaulted and detained. Nor does it have any bearing on the "reason" why he was detained or the "nature of the torture that he allegedly suffered," in contrast to the significant discrepancies that justified an adverse credibility finding in *Singh-Kaur v. INS*, 183 F.3d 1147, 1151-52 (9th Cir. 1999), cited by the dissent. Furthermore, it is likely that some of these "minor" discrepancies may have been caused by the translation difficulties apparent in the transcript. "[W]e have long recognized that difficulties in interpretation may result in seeming inconsistencies, especially in cases . . . where there is a language barrier." *Mendoza Manimbao*, 329 F.3d at 662. We are especially cautious in attributing any weight to an inconsistency that likely relates more to a mismatch of terms after translation than to Suntharalinkam's claim.

Fifth, the IJ found unconvincing Suntharalinkam's account of the abuses he suffered during his sixty-day detention from January to March 2000. Suntharalinkam testified that he was burned with cigarettes on three occasions, and he showed the IJ the resulting scars on his legs. The IJ viewed the burns and did not question that they were in fact burns. He nevertheless did not credit Suntharalinkam's testimony that they were made by cigarettes, noting that their size, about the size of a dime, a quarter, and a silver dollar, was inconsistent with cigarettes. However, the IJ failed to ask Suntharalinkam to explain the size discrepancies. The IJ stated that "[i]n light of the disparity and size" of the scars, he "very much doubts" that the scars were in fact caused by cigarette burns.

[6] Again, the IJ's incredulity was based on speculation and conjecture. Just as in *Bandari v. INS*, 227 F.3d 1160 (9th Cir. 2000), where we rejected the IJ's credibility determination, based on the judgment that it was "incredible and implausible" that the petitioner "would have been beaten for a period of 20 minutes with a rubber hose and not bleed," because the finding was "based solely on her subjective view of when a

person should bleed given her view of the severity of the flog-ging," *Id.* at 1167 (internal quotation marks omitted), the IJ here had no basis to conclude that torturing a person over sixty days with burning cigarettes would result in small dis-crete burns the size of American cigarettes. Depending on the patterns of the burning that caused the scarring and the size of the cigarettes, scars like Suntharalinkam's could very well result. The IJ had no basis for knowing how the burn scars were made, how many times Suntharalinkam was burned, or what sort of scarring results from torture over a sustained period by burning cigarettes. Nor did the IJ ask Suntha-ralinkam to explain the "supposed" size discrepancy, which may not have been a discrepancy at all. The IJ must provide applicants with a reasonable opportunity to explain any per-ceived inconsistencies that factor into the adverse credibility finding. *See Chen v. Ashcroft*, 362 F.3d 611, 618 (9th Cir. 2004) (reversing negative credibility finding because, *inter alia*, petitioner was denied a reasonable opportunity to explain a perceived inconsistency); *Guo v. Ashcroft*, 361 F.3d 1194, 1200 (9th Cir. 2004) (same). Because the IJ failed to adhere to this requirement, and because there was not necessarily any discrepancy at all, the IJ should not have relied upon the size of the burns in making the adverse credibility determination.

**[7]** Sixth, the IJ commented that it was "noteworthy" that Suntharalinkam had testified during the hearing that he was hospitalized for some ten days following his release from detention, whereas his asylum application did not mention hospitalization and instead only referred to medical treatment that he received at that time. The IJ's concern is unfounded, as in fact there is no "discrepancy" between the application and Suntharalinkam's testimony that can legally form the basis of an adverse credibility decision. An adverse credibility finding cannot be based on petitioner providing testimony that is more detailed than the information presented in the asylum application. *See Singh v. INS*, 292 F.3d 1017, 1021 (9th Cir. 2002) (holding that an adverse credibility determination can-not be based on trial testimony that is more detailed than the

applicant's initial statements at the airport). Here, there is no contradiction between the two accounts.

Suntharalinkam's asylum application states that he "took medical treatment for injuries due to army's mistreatments," an account that does not conflict in any way with his testimony that he was hospitalized. When asked to explain why he only generally recounted that he had received medical treatment rather than specifying that he was hospitalized, Suntharalinkam responded, "I, I thought only state that I took treatment what would be enough." Because there is no inconsistency, but merely provision of greater detail at the hearing, this, too, is an inadequate basis for the IJ's credibility determination.

The IJ also based his adverse credibility determination on what he saw as a conflict between the medical records Suntharalinkam produced to prove that he was hospitalized for injuries after the first detention and his testimony regarding the medical treatment he received. The medical records, while supporting Suntharalinkam's testimony that he received medical treatment following his release from detention, failed to mention that Suntharalinkam was treated for any injuries resulting from torture, but instead stated only that he was treated for hepatitis. The IJ's finding is problematic for two reasons. First, this purported "discrepancy" is not necessarily a discrepancy at all. The IJ's characterization of the two as conflicting stems once again from his own speculation as to what a Sri Lankan medical record should state. The IJ knew nothing about Suntharalinkam's health at the time he was released from the torture center, nor did he ask about it. There is no basis in the record to decide that the medical record is inconsistent with Suntharalinkam's testimony. Suntharalinkam may in fact have been treated for hepatitis at the hospital. In the United States, for example, hepatitis in correctional settings is prevalent, and incarcerated persons suffer from hepatitis at a far greater rate than the average population. *See* Cindy Weinbaum *et al.*, Prevention and Control of Infec-

tions with Hepatitis Viruses in Correctional Settings, Jan. 24, 2003.[2] The same may very well be true for persons newly released from detention in Sri Lanka, where it would be logical to assume unsanitary conditions and contaminated food in detention centers for suspected terrorists.

Nor is there any information in the record about record-keeping in medical clinics in Sri Lanka. Neither the IJ nor we have any basis to assume that the medical records would include every wound as is typical of hospitals in the United States. Perhaps the clinic physicians and staff routinely fail to document evidence of torture by security forces, for fear of retribution by the government against themselves, and instead listed Suntharalinkam as afflicted only with hepatitis, when he could have had hepatitis and other wounds. Perhaps the clinic is run by the government and as a result the staff and physicians are instructed not to document the nature of a government torture victim's injuries. Given that the government was at the time prosecuting a war and engaging in arbitrary arrests and torture, according to the State Department reports, either of these possibilities is more compelling than a conclusion that Suntharalinkam, knowing that his credibility was on the line, intentionally submitted a Sri Lankan document that he knew was inconsistent with his testimony after the IJ had asked him to provide documentation to corroborate his testimony about his medical treatment. He obviously believed that it supported his testimony based on his personal knowledge of how Sri Lankan medical records are created and maintained.

This is precisely why the IJ was required to provide Suntharalinkam an opportunity to explain why his medical record only accounted for his treatment for hepatitis, a requirement with which the IJ failed to comply, and the second of the two reasons this ground does not support the adverse credibility finding. *See Chen*, 362 F.3d at 618 (reversing negative credi-

---

[2]This can be found at http://www.cdc.gov/mmwr/preview/mmwrhtml/rr5201a1.htm.

bility finding where petitioner was denied a reasonable opportunity to explain a perceived inconsistency); *Guo*, 361 F.3d at 1200 (same). Where we are left to wonder whether a discrepancy exists between the medical records and Suntharalinkam's testimony, or whether there is a reasonable explanation to reconcile the two had the IJ simply adhered to his obligation to inquire into such an explanation, we will not uphold an adverse credibility finding. Contrary to the government's argument, putting Suntharalinkam on notice that his credibility generally was left open to question is not sufficient. The IJ is required to give the petitioner the opportunity to explain specific perceived discrepancies. Otherwise, the IJ is free to base an adverse credibility finding on disparities that, if given an opportunity, could be explained credibly by the petitioner, and we are left to speculate as to whether there is some rational explanation for the discrepancy the IJ thinks he sees. *See Chen*, 362 F.3d at 618 (holding that because petitioner "was denied a reasonable opportunity to explain what the IJ perceived as an inconsistency in her testimony[,] [t]he IJ's doubt about the veracity of her story . . . cannot serve as a basis for the denial of asylum").

**[8]** *Singh v. Ashcroft*, 367 F.3d 1139, 1143 (9th Cir. 2004), cited by the dissent, is inapposite. *Singh* did not involve a conflict between medical records and testimony as to the injuries which the petitioner claimed were the result of persecution. Instead, the conflict in *Singh* was regarding the date of a letter submitted by petitioner to corroborate injuries that he testified he received, but which were not evident in a photograph taken at the time of the alleged injuries. *Id.* at 1141. Singh, unlike Suntharalinkam, was asked to explain the date discrepancy on the letter he submitted, and the panel there upheld the IJ's determination that Singh's explanation was unconvincing. *Id.* at 1142-43. Here, in contrast, we do not know whether Suntharalinkam has a convincing explanation for the discrepancy or whether he has no explanation for it. This is why the law imposes on the IJ an obligation to request an explanation for perceived inconsistencies, and why we

may not uphold an adverse credibility finding that is based on a purported discrepancy that the petitioner is not given an opportunity to explain. We do not hold that a discrepancy between Suntharalinkam's medical records and testimony, if any, would per se be inadequate to support an adverse credibility finding. Instead, we hold that it is unclear whether there is a discrepancy at all, and because the IJ failed to adhere to his duty to ask for an explanation for the purported discrepancy, we will not uphold this as a basis for the adverse credibility finding.

[9] We find similar error in the IJ's focus on Suntharalinkam's testimony that soldiers who detained him in May 2001 "asked" him to come to the camp, which the IJ characterizes as inconsistent with Suntharalinkam's description of the incident as an arrest. The IJ did not give Suntharalinkam an opportunity to explain this seeming discrepancy at the hearing; the government's attorney asked only whether he was forced or requested to join the officers. Suntharalinkam responded that he was forced, but the IJ was apparently unconvinced by his answer, though he did not request further explanation. Suntharalinkam now explains that the IJ misunderstands political conditions in Sri Lanka, and that when a group of officers "asks" an individual to accompany them, that is not a request, but rather is an order that the individual is not free to refuse. If the IJ had pointed out his disbelief during the hearing and asked Suntharalinkam for further explanation, as he was required to do, Suntharalinkam would have been able to address the IJ's concerns about whether he was arrested or whether he joined the officers by choice. Without that opportunity, this supposed discrepancy cannot form the basis of an adverse credibility finding. The IJ's suggestion that Suntharalinkam's choice of words renders his testimony incredible, moreover, is based on speculation and conjecture. The IJ has no basis for assuming that the fact that Suntharalinkam was "asked" to accompany the soldiers to the camp means that he was not in fact arrested and detained as he testified.

The IJ also focused on what he characterized as discrepancies in Suntharalinkam's account of his sister's experience during the May 2001 detention. Specifically, Suntharalinkam's asylum application stated that a bribe paid by his mother secured "our" release, whereas he testified at the hearing that his sister was released the day after they were first detained. The IJ asked Suntharalinkam to explain why he used the word "our" in his declaration, but Suntharalinkam's response was "indiscernible" according to the hearing transcript. Because this detail does not affect or enhance the merits of Suntharalinkam's claim, and because it was probably the result of a translation difficulty, we hold that an adverse credibility finding cannot be based on this purported inconsistency, which, again, may not have been one at all. *See Zahedi v. INS*, 222 F.3d 1157, 1167-68 (9th Cir. 2000) (holding that IJ's adverse credibility was not supported by substantial evidence where "there were significant communication and translation problems . . . during the asylum hearing" and the discrepancies at issue were not crucial to petitioner's claim).

**[10]** Eighth, the IJ noted that during Suntharalinkam's interactions with United States border officials at San Ysidro and in his asylum application, he had stated that his father had died in the year 2000 of natural causes, whereas his father's death certificate indicated that he died in 1994 of a heart attack. The IJ acknowledged Suntharalinkam's argument that statements given to officials at the time of arrest should not be given much weight in light of the conditions of custody, and noted that he considered the inconsistent statement "as just one of many made." The time and cause of Suntharalinkam's father's death, however, are wholly irrelevant to Suntharalinkam's claim for relief. The circumstances of the death neither undermine nor enhance his claim of persecution. "If discrepancies cannot be viewed as attempts by the applicant to enhance his claims of persecution, [they] have no bearing on credibility." *Shah v. INS*, 220 F.3d 1062, 1068 (9th Cir. 2000) (alteration in original) (internal quotation marks omitted).

**[11]** The IJ explained that the adverse credibility finding rested not on any one of the discrepancies he identified in particular, but instead on what he described as "a tapestry of inconsistency that simply strains credibility to the breaking point." The IJ acknowledged repeatedly that each discrepancy appeared minor but concluded that overall Suntharalinkam's credibility was ultimately damaged by the sum of the discrepancies. The IJ did not err in assessing the discrepancies in light of all the evidence presented rather than in isolation. *See Kaur v. Gonzales*, 418 F.3d 1061, 1067 (9th Cir. 2005) (concluding that the "repeated and significant inconsistencies in [petitioner's] testimony deprive[d] her claim of the requisite 'ring of truth' "). But the inconsistencies on which the IJ relied in finding the cumulative impact sufficient to support an adverse credibility finding were not "significant," and the totality of the purported inconsistencies does not add up to a sufficient basis for an adverse credibility finding. Since only one of eight alleged discrepancies was actually a discrepancy (the time and cause of Suntharalinkam's father's death), and the one was entirely unrelated to Suntharalinkam's claim, none supports the adverse credibility determination either individually or in combination. Just as under criminal law "one error is not cumulative error," *United States v. Sager*, 227 F.3d 1138, 1149 (9th Cir. 2000), one discrepancy that does not go to the heart of the claim cannot cumulatively support an adverse credibility finding.

**[12]** We further note that the IJ erred in relying on the testimony and report offered by Agent Schultz in making his decision. Schultz's conclusions rested in large part on the similarities in the asylum applications of the members of the group with whom Suntharalinkam traveled: They were all Tamil and were from LTTE-controlled areas on the Jaffna Peninsula; all had been detained and tortured by the Sri Lankan army on account of their suspected membership in the LTTE; all were not members of the LTTE; and all claimed to have traveled from Jordan to Mexico but in fact had traveled through Bangkok, South Africa, and Brazil. Agent Schultz did

not provide any information about Suntharalinkam in particular. Instead, he relied on Canadian intelligence reports that "most if not all of the subjects" were members or associates of the LTTE and were being smuggled by an organization controlled by the LTTE based in Toronto. Schultz opined that "if a person is Tamil they are expected to support the LTTE. . . . If that support is not received the punishment will be swift and violent . . . . If a Tamil person wanted to reach Canada, by other than legitimate means, they would have to do so through the LTTE. If they did not their remaining family in Sri Lanka would face retribution." Schultz's conclusions thus rest on assumptions about the political affiliations of Tamils in Sri Lanka and the ways by which a Tamil in Sri Lanka could reach the United States.

The IJ may consider generalized reports, such as the State Department's Country Reports, in evaluating a petitioner's credibility. *See Zheng v. Ashcroft*, 397 F.3d 1139, 1143 (9th Cir. 2005). However, we have repeatedly explained that just as the IJ may not rely on his or her own speculation and conjecture, neither may the IJ rely on the speculation and conjecture of a government report. The conclusions in Agent Schultz's report derive from his analysis of general trends and conditions in Sri Lanka, not from individualized facts about Suntharalinkam or the evidence presented before the IJ. Moreover, the IJ must conduct an individualized credibility analysis, and it is improper to rely exclusively on a general assertion in a government report to declare an applicant not credible. *See Ge*, 367 F.3d at 1126 (to the extent that the IJ relied on blanket statements in the State Department report regarding detention conditions in China, the IJ's finding was not sufficiently individualized); *Shah*, 220 F.3d at 1069 (holding that the IJ may not rely "on a factually unsupported assertion in a State Department report to deem [an applicant] not credible"). Here, Schultz bases his conclusion that Suntharalinkam is an LTTE member on his generalized surmises about the fact that a Tamil living in particular areas of Sri Lanka cannot avoid being a member of the LTTE; that a

Tamil cannot reach Canada other than through means organized by the LTTE; and that the group traveled with escorts who have been involved in alien smuggling that provides funding for the LTTE. These generalized statements are insufficient to support an adverse credibility decision; indeed, Schultz's judgments about Suntharalinkam are based on speculation and conjecture regarding the provenance of the group of twenty-two and political conditions in Sri Lanka. Because the IJ must determine Suntharalinkam's credibility based on the circumstances of his particular situation, the general trends that Schultz points out to the IJ should not be relied upon to support the credibility determination.

Moreover, even if Schultz's intelligence regarding the smugglers was correct, we cannot find any reason why the fact that Suntharalinkam relied on an agent affiliated with the LTTE to get him to the United States should have any bearing on his credibility, as the IJ would have it. Suntharalinkam testified that he was persecuted by the government because of its suspicion that he was a member of the LTTE. Whether he took advantage of the LTTE's expertise in alien smuggling to flee arbitrary arrest and detention in Sri Lanka does not bear on his account of the abuses he suffered in Sri Lanka at the hands of government security forces.

Moreover, Suntharalinkam never claimed that his smugglers were not affiliated with the LTTE; indeed, the matter was never addressed at the hearing. Credibility is simply not at issue on this point, despite the IJ's attempts to find some basis in Schultz's testimony for an adverse credibility finding. Further, that all members of the group posed as actors in Mexico and traveled through the same route is indicative of nothing other than that they indeed traveled as a group, another fact not at issue. The house of cards upon which the IJ built his adverse credibility determination thus collapses under serious review. It appears that the IJ manufactured a ground for denying relief in light of the charges contained in Schultz's report.

We are sympathetic to the IJ's interest in preventing a member of a terrorist organization from obtaining asylum in this country, and we recognize the government's absolute and critical interest in preventing the admission of an individual that it believes is a member of a terrorist organization. If in fact there is reasonable suspicion that Suntharalinkam is a terrorist, then it is in all our interests that the DHS investigate and pursue him if not through criminal avenues, then by asserting the terrorist bar to asylum, *see* 8 U.S.C. § 1158(b)(2)(A)(iv), the application of which automatically bars withholding and CAT relief, *see Bellout v. Ashcroft*, 363 F.3d 975, 977-79 (9th Cir. 2004), or by relying on the Attorney General's exercise of discretion to deny asylum to individuals who are suspected members of terrorist organizations, *see Kalubi v. Ashcroft*, 364 F.3d 1134, 1139 (9th Cir. 2004). We cannot disregard the law because it appears that Suntharalinkam may have terrorist affiliations; as the IJ virtually acknowledged, Suntharalinkam told a credible story.

### B.

The IJ properly rejected admission of Suntharalinkam's proposed corroborating evidence on the ground of its questionable authenticity. The IJ denied admission of three letters written by Velautham Kumarasamy, a Sri Lankan Justice of the Peace who attested to Suntharalinkam's three detentions, sustaining the government's objection to the letters that the documents "d[id] not meet the most minimal requirements for a submission into evidence."

**[13]** "Documents may be authenticated in immigration proceedings through any recognized procedure, such as those required by INS regulations or by the Federal Rules of Civil Procedure." *Khan v. INS*, 237 F.3d 1143, 1144 (9th Cir. 2001) (per curiam) (internal quotation marks omitted). While the IJ neglected to note that "8 C.F.R. § 287.6 provides one, but not the exclusive, method for establishing a sufficient basis for admission of a writing in a deportation proceeding," *Iran v.*

*INS*, 656 F.2d 469, 472 n.8 (9th Cir. 1981), the IJ nonetheless was correct in determining that the documents were not properly authenticated, as there was no indication that they were in fact from a government official. Of course, the failure to supply affirmative authentication for documents does not support an adverse credibility finding. *See Wang*, 352 F.3d at 1254. But here, the IJ did not purport to rely on the lack of authentication as part of the adverse credibility finding. Instead, the lack of authentication motivated only his refusal to admit the documents into evidence, and thus was not error.

Contrary to Suntharalinkam's claim that the IJ failed to consider the background materials he provided, the IJ in fact considered these documents. The IJ noted the background materials Suntharalinkam provided and specifically referred to the Department of State reports as well as other items from the news media. The IJ mentioned the reports' discussions of the ceasefire in Sri Lanka, the present state of the conflict, and the apparent end to abuses previously committed by the Sri Lankan Army and by the LTTE. Thus, Suntharalinkam's claim that the IJ failed to consider this information lacks merit.

## C.

**[14]** Nor did the IJ err in declining to consider Suntharalinkam's eligibility for asylum based on a "pattern or practice" of persecution. 8 C.F.R. § 208.13(b)(2)(iii) allows an asylum applicant to prove a well-founded fear of persecution without an individualized showing as long as the applicant can establish membership in a group against which "there is a pattern or practice . . . of persecution against persons similarly situated on account of race, religion, nationality, membership in a particular social group, or political opinion." Suntharalinkam failed to establish, however, that he is a member of a group against which there is a pattern or practice of persecution. Although Tamil civilians may have at one time been persecuted by the Sri Lankan government or security

forces, the record supports the IJ's conclusion that this no longer is the case. Suntharalinkam provided background reports detailing, for example, the "[l]arge-scale round-ups of Tamil civilians [that] continue to take place, particularly following LTTE attacks." The 2001 State Department Country Report also affirmed "[l]arge-scale arrests of Tamils . . . during the year," and reported that despite legal prohibitions against torture, security forces and police continued to torture persons in custody, especially Tamils who were detained on suspicion of being members or supporters of the LTTE. The IJ, however, credited the more recent 2002 State Department report, which noted that "there were no large-scale arrests of Tamils during the year," and commented that although in the past arbitrary arrest and detention "were problems," "[t]here were no reports of arbitrary arrests during the year." In rejecting Suntharalinkam's testimony that he feared he would still be in danger in Sri Lanka, the IJ relied on reports that abuses by the Sri Lankan army had ceased, as well as on the ceasefire agreement and the fact that the war had not resumed. Thus, the IJ's conclusion that Suntharalinkam was not eligible for asylum under a "pattern or practice" theory is supported by substantial evidence.

**D.**

Suntharalinkam argues that the IJ erred in denying him relief under the CAT on the ground that he was not credible. We reject the government's contention that Suntharalinkam failed to raise this claim before the BIA and therefore did not preserve this matter for appellate review. *See Barron v. Ashcroft*, 358 F.3d 674, 678 (9th Cir. 2004). Although Suntharalinkam did not specifically contend that the IJ's analysis under the CAT was error, he did appeal the IJ's decision to deny relief under the CAT, and therefore he preserved the issue for appeal. We decline to reach the merits of this claim, however, because we remand the question to the BIA.

**IV.**

**[15]** Because the adverse credibility finding is not supported by substantial evidence, we remand to the BIA to consider, taking his testimony as true, whether Suntharalinkam has met the necessary conditions for eligibility for asylum, withholding of removal, and relief under the Convention Against Torture, as well as any other issues that may preclude his admission into this country. *See INS v. Ventura*, 537 U.S. 12, 17 (2002) (per curiam); *see also Chen*, 362 F.3d at 621-23.

**PETITION GRANTED; REVERSED AND REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.**

---

RAWLINSON, Circuit Judge, dissenting:

I respectfully dissent. I simply cannot agree that we are compelled to find Suntharalinkam credible. *See Malhi v. INS*, 336 F.3d 989, 993 (9th Cir. 2003) (explaining the special deference accorded to the BIA's credibility determination). As the majority opinion recognizes, so long as one of the Immigration Judge's identified reasons for disbelieving Suntharalinkam is supported by substantial evidence and goes to the heart of the persecution claim, we must accept the Immigration Judge's adverse credibility determination. Majority Opinion at 9938. *See Li v. Ashcroft*, 378 F.3d 959, 964 (9th Cir. 2004). Additionally, we have endorsed the concept of cumulative incredulity. *See Pal v. INS*, 204 F.3d 935, 938 (9th Cir. 2000).

The majority opinion takes issue with the IJ's finding that Suntharalinkam's testimony regarding employment that was not included in his asylum application supported an adverse credibility finding. Majority Opinion at 9940. However, we

have specifically recognized testimony that is inconsistent with the details of the asylum application as supporting an adverse credibility determination. *See id.*

The majority also faults the IJ for relying on the omission of Suntharalinkam's August, 2000, detention from his asylum application. Majority Opinion at 9941. However, we have upheld an adverse credibility determination for just that reason. *See Alvarez-Santos v. INS*, 332 F.3d 1245, 1254 (9th Cir. 2003).

I disagree with the majority's conclusion that Suntharalinkam's discrepant testimony regarding the soldiers' foray into the family's home was not significant. Majority Opinion at 9941-42. Because the incident with the soldiers is a critical component of Suntharalinkam's persecution claim, any inconsistency in the details of this crucial incident may support an adverse credibility finding. *See Singh-Kaur v. INS*, 183 F.3d 1147, 1151-52 (9th Cir. 1999).

I also take issue with the majority's conclusion regarding the conflict between Suntharalinkam's testimony describing his medical treatment and the records produced to support that testimony. Majority Opinion at 9943-46.

Suntharalinkam testified that he was treated for injuries sustained when he was beaten. However, the hospital records he produced reflect that he was treated for hepatitis, not for injuries suffered as a result of a beating. We have held that a conflict between testimony and medical documents offered to bolster that testimony constitutes substantial evidence to support an adverse credibility determination. *See Singh v. Ashcroft*, 367 F.3d 1139, 1143 (9th Cir. 2004). And we did so without imposing any requirement that the applicant be afforded an opportunity to explain any discrepancy between his testimony and the documentary evidence. *See id.*

Neither of the two cases cited by the majority is to the contrary.

In *Guo v. Ashcroft*, 361 F.3d 1194, 1200 (9th Cir. 2004), we ruled that "*unclear testimony* may not serve as substantial evidence for an adverse credibility finding when an applicant is not given the chance to attempt to clarify his or her testimony." (citation omitted) (emphasis added). Similarly, in *Chen v. Ashcroft*, 362 F.3d 611, 617 (9th Cir. 2004), we explored the IJ's finding that the applicant, *in her testimony*, had not "offered a 'reasonable explanation' as to why she and her husband did not request official permission from state family planning authorities to have their first child." We focused on the fact that

> [t]he IJ did not question her further concerning her failure to request permission to become pregnant. Instead, he moved on to another subject, leaving this court to speculate whether Mrs. Chen did not fully understand the nature of the question *due to the difficulties of translation*, or whether she had feared that a fine would be assessed immediately, or worse, that she would have been required to abort her child.

*Id.* at 618 (emphasis added).

In view of the translation difficulties and the vague nature of the applicant's response, we understandably concluded that the IJ should have afforded the applicant an opportunity to explain any perceived inconsistencies *in her testimony* in response to questions posed by the IJ. *See id.*

In this case, there has been no assertion that Suntharalinkam's testimony was vague or unclear. Neither was there a hint of translation difficulties.[3] Suntharalinkam testified clearly and directly that he was treated for *injuries* sustained when he was beaten. Yet his documentary evidence reflects

---

[3]Although the majority opinion refers to "translation difficulties apparent in the transcript," Majority Opinion at 9943, no reference to translation difficulties was made by the Petitioner.

treatment for hepatitis rather than for injuries sustained in a beating. In this circumstance, our precedent does not mandate that the IJ explicitly question the applicant further about a discrepancy between the applicant's testimony and documentary evidence offered to support that testimony. *See Singh*, 367 F.3d at 1143. This is especially true when one considers the fact that *Guo* and *Chen* imposed the requirement of giving the applicant the opportunity to clarify his testimony when that testimony is in response to questions posed by the IJ. *See Guo*, 361 F.3d at 1200 (discussing a "colloquy between the IJ and [the witness]"); *see also Chen*, 362 F.3d at 618 (referring to questioning by the IJ).

The majority concedes that the IJ appropriately assessed credibility in view of all the evidence presented. Majority Opinion at 9947-48. Yet, the majority does not consider the cumulative discrepancies as adequate to support an adverse credibility determination. *See id*. My view is exactly the opposite. I consider each of the discrepancies discussed above as adequate to sustain the IJ's credibility determination, when viewed through the extremely deferential lens we must don. *See Malhi*, 336 F.3d at 993. As I am not of the view that we are *compelled* to find Suntharalinkam credible, I would deny his petition.